THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DANIEL AVILA, Defendant-Appellant.

First District (3rd Division)   No. 1—88—0511

Opinion filed March 1, 1989.

Daniel J. Stohr, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Marilyn F. Schlesinger, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

A jury found defendant Daniel Avila guilty of criminal sexual assault with a minor family member. The trial court sentenced defendant to a term of four years' imprisonment. Defendant appeals, contending that he was not proved guilty beyond a reasonable doubt; that he was denied an impartial jury; that the jury instruction on criminal sexual assault failed to include a mental state; that the court failed to *sua sponte* give a jury instruction on prior inconsistent statements; and that his sentence was predicated on erroneous considerations.

Defendant was convicted of criminal sexual assault following an incident on February 28, 1986, involving acts of cunnilingus and fellatio with his 16-year-old stepdaughter.

At trial, the victim testified that when she was seven or eight years old, her mother married defendant. When she was eight, defendant began fondling her and instructing her to fondle his genitals. The incidents typically occurred after school when her mother was at work.

By the time the victim was 10 or 11 years old, the sexual relations occurred three or four times a week. They first progressed to include oral sex, and later, vaginal intercourse. Typically the victim would return from school and find defendant had bathed and was waiting for her. He would tell her what she had to do. The victim testified as to the precise positions and sexual acts defendant instructed her to perform.

The victim initially believed the sexual demands were a normal thing to do. She later attempted to refuse defendant's demands. He hit her with a belt two or three times when she refused to obey his orders to go into the bedroom. Defendant often warned that the victim would break up the family if she told anyone.

During high school, the victim argued with defendant more about the sexual demands. During one argument, the victim threatened to tell her mother. Defendant replied that he had already done so. The victim told her mother about it after arguing with defendant. Her mother yelled at defendant, "You better not be doing that again." The victim did not tell her mother about it again because the victim believed her mother would not do anything about it.

When the victim was 15 years old, defendant began adoption proceedings. She appeared before a judge, who asked whether she had any complaints or objections to being adopted, and the victim replied "No." She replied similarly to a guardian's questions.

The sexual demands and routine continued. Defendant would often leave in the afternoon to take his children to hockey practice and would usually return home immediately. As a sophomore, the victim began participating in track after school and returned home by 6 p.m.

On February 28, 1986, the victim arrived home at 5:30 p.m. She began doing her homework when defendant told her to "wash up and go in the bedroom." She complied with his demands for oral sex. This was the last day she engaged in any sexual conduct with defendant.

On March 3, 1986, the victim returned from track practice at 6 p.m. and found her mother waiting for her at the bus stop. She was angry because the victim had told her she would be home by 5:30 p.m. Her mother continued yelling at her on the way home and began hitting the victim with a whiffle bat. The mother told the victim that defendant was angry because she was not at home. The victim went to her room and remained in bed until the next day, when she telephoned her grandmother for help. Her grandmother in turn telephoned the victim's father.

The victim's father picked her up and asked what was wrong. "He had been asking me questions, you know, about why I was upset because I was crying. And then he said, 'He isn't messing with you, is he?' And I started crying and I said, 'Yes.'" The victim testified that part of the reason she did not want to go home after March 3 was because she had fought with her mother. She denied that she wanted to leave home so she could avoid taking care of her brothers and sister. The victim continued to live with her grandparents for several years and was an 18-year-old freshman in college when she testified.

Charles Whaley, the victim's father, testified for the State that on March 4 he picked up his daughter, who was crying. When they arrived at his home, he asked her questions. On the following day, he reported defendant's conduct to the Illinois Department of Children and Family Services' child abuse hot line.

Mary Jo Avila, the victim's mother, testified for defendant that during the years the victim lived at home, the mother worked from 2:30 p.m. to 11 p.m. She had three children from her marriage with defendant. The mother had never observed abnormal conduct by defendant and believed he was a very good father to all four children.

Prior to high school, her daughter "was nice and sweet and kind and very considerate to the other children and to me." After entering

high school, the victim became belligerent, hostile, and hard to control. The mother did not approve of her daughter's choices of boyfriends.

The mother testified that on February 28 she telephoned her daughter at home at about 6 p.m. The mother knew defendant was at the ice rink with the other three children from 4 to 8 p.m. that day because the victim said there was nobody at home. On March 3, a holiday, the victim did not return from track practice until about 8 p.m., when they argued on the street about her lateness. The mother admitted beating her daughter with a whiffle bat because she "was tired of her lying to me, telling me she was one place, and I did not believe she was there."

The mother described her relationship with defendant as adequate. She never saw him abuse any of the children. Neither her daughter nor defendant ever reported any type of sexual abuse. She stated, "I don't know anything about any sexual abuse of a female child."

The mother denied hearing any discussion where her daughter told defendant, "I'm going to tell my mother," or where the mother told defendant "Don't do it again." The mother did not recall speaking to the Whaleys on March 9 when defendant was arrested. She denied telling Pearl Whaley that she knew defendant was sexually abusing the victim.

Defendant testified that he was a refuse collection coordinator for the City of Chicago. He denied having any sexual relations with the victim. He complained about her behavior. "You couldn't tell her anything. You couldn't talk to her." Defendant testified further that he "hated to come home from work because every day, every day, the arguing, fighting and the bickering" with the victim was too upsetting. Consequently, he began taking the other three children skating every day at about 4 p.m. He always stayed at the ice rink.

The adoption of the victim by defendant was not completed "because we were having a lot of trouble with her." He did not believe that she wanted to be part of the family, and he did not want to be responsible for her. Defendant denied ever hitting the victim with a belt.

On February 28, defendant was at the ice rink from about 4 p.m. until 8:30 p.m. He did not see the victim at all that night.

Pearl Whaley, the victim's paternal grandmother, testified in rebuttal that on March 9 she was at the police station with her husband and the mother. Whaley asked the mother "if she had indeed known about this before, and she said that, yes, she had known of it prior,

about two years ago, but she was under the impression that it had stopped." On cross-examination, Whaley testified that she reported this conversation to the State's Attorney and to a DCFS caseworker. In surrebuttal, the mother again denied having such a conversation with Whaley.

██ ■ Defendant first contends that he was not proved guilty beyond a reasonable doubt. Courts of review are charged with a special duty to carefully examine the evidence in rape cases. (*People v. Lewis* (1984), 103 Ill. 2d 111, 468 N.E.2d 1222.) Nevertheless, in sexual abuse prosecutions where the testimony of the complaining witness is clear and convincing, or is independently corroborated, the reviewing court will not overturn a finding of guilty unless the evidence is so palpably contrary to the finding or so unreasonable and improbable as to cause a reasonable doubt as to defendant's guilt. (*People v. Lewis*, 103 Ill. 2d 111, 468 N.E.2d 1222; *People v. Goebel* (1987), 161 Ill. App. 3d 113, 514 N.E.2d 60.) The reviewing court should not substitute its judgment for that of the trier of fact on questions involving the weight of evidence or the credibility of witnesses in cases involving alleged sexual offenses. *People v. Laughlin* (1987), 163 Ill. App. 3d 115, 516 N.E.2d 535.

■ In the present case, the victim testified that she suffered defendant's molestation for eight years. She detailed the times, places and manner of the assaults, including the final incident, which occurred on February 28, 1986. Her specific, graphic testimony on both direct and cross-examination depicted a credible, unequivocal pattern of forced, incestuous relations. The victim described the steady progression over the eight-year period from inappropriate fondling, to oral sex, to intercourse. She offered credible testimony regarding defendant's opportunities and access to her, noting that defendant initiated the sexual rituals three or four times a week after school, when her mother was at work and the younger children were at hockey or otherwise sent away from the bedroom area.

Typically, defendant bathed, awaited the victim's return from school, and ordered her to bathe, cover herself with only a towel, and go to the bedroom. The victim testified, without inconsistencies, to the precise positions and sexual acts defendant demanded of her throughout her childhood and adolescence.

In regard to the final sexual assault, the victim testified that, consistent with his pattern throughout her childhood, defendant interrupted her homework, demanded she "wash up and go in the bedroom," where she complied with his instructions for oral sex. When the victim returned from track practice on the following Monday, her

mother met her outside the home, screaming at the victim and beating her with a whiffle bat. The victim remained in bed until the next day when she telephoned her grandmother for help. When the victim's father questioned her about defendant's conduct, the victim started crying and acknowledged the sexual abuse.

Defendant attacks the victim's credibility mainly on the basis that she delayed reporting any abuse until she fought with her mother about an unrelated issue. The victim explained that when she was younger she did not understand the meaning of the sexual conduct and thought it was normal. As she became older, she understood it was wrong, but was led to believe by both defendant and her mother that she had no alternative but to comply. The victim recounted defendant's accusations that she was trying to destroy the family, was being "mean," and warned that she would get no help from her mother. Her mother confirmed this when she responded to the victim's report simply by telling defendant, "You better not be doing that again."

The victim also offered a reasonable explanation for her failure to make a prompt complaint of the February 28, 1986, incident. She portrayed a history of eight years of manipulation, abuse and feeling abandoned in a position of helplessness, believing that any resistance to defendant's sexual demands was futile. The jury could believe that the victim finally left home as a result of both her stepfather's sexual assaults and her mother's violence. One reason did not preclude the other.

The jury was entitled to disbelieve the testimony of defendant and the victim's mother. The jury was also entitled to give little weight to defendant's implications that the victim's testimony could be explained by the fact that children "see everything on TV. It is unbelievable what they see on TV today."

The mother's credibility suffered when the State perfected its impeachment of her testimony. Pearl Whaley testified that at the police station, the mother admitted knowing that her husband molested her daughter. She had been under the impression, however, that it had stopped when her daughter was 14 years old.

The jury could determine the credibility of the witnesses and reasonably conclude that the testimony of the victim was clear and convincing. The evidence is not so palpably contrary to the findings or so unreasonable and improbable as to cause a reasonable doubt as to defendant's guilt.

■ Defendant next contends that the State violated the constitution when it exercised peremptory challenges to exclude one His-

panic and one black during *voir dire*. The equal protection clause forbids the State from peremptorily challenging potential jurors solely on account of race. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) Defendant must first establish a *prima facie* case of discrimination, after which the burden shifts to the prosecution to come forward with race-neutral explanations for striking the veniremen at issue. (*Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) The trial court's findings as to whether purposeful discrimination occurred largely turn on an evaluation of credibility. Those findings, therefore, should receive great deference and will not be overturned on review unless they are found to be against the manifest weight of the evidence. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712; *People v. Evans* (1988), 125 Ill. 2d 50, 61, 530 N.E.2d 1360.

To establish a *prima facie* case of discrimination, defendant must first show that the State exercised its peremptory challenges to remove members of a cognizable racial group from the venire and that defendant is a member of that group. (*Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712; *People v. McDonald* (1988), 125 Ill. 2d 182, 196, 530 N.E.2d 1351.) Defendant is Hispanic, which is a cognizable racial group. (*Castaneda v. Partida* (1977), 430 U.S. 482, 51 L. Ed. 2d 498, 97 S. Ct. 1272.) The State, however, did not exercise a "pattern" of challenges. There is no evidence presented which might raise an inference of purposeful discrimination. *People v. McDonald*, 125 Ill. 2d 182, 530 N.E.2d 1351.

The venire consisted of 45 persons. The racial composition is unknown. Defendant exercised six challenges. The State peremptorily challenged four veniremen. These included one black female and one Mexican, Hernandez Padilla. Padilla informed the court that he often returned to Mexico to work. He was presently unemployed in the United States. The State excused Padilla, and defendant objected, claiming that the State was improperly excluding Hispanics. The court noted Padilla's statement about leaving the country and found no indication of discriminatory purpose.

Defense counsel suggested that another person, Roger Metoxen, might have been Hispanic, but the trial court disagreed. Defendant's objection as to the challenge of Metoxen is waived, as defendant offered no independent evidence to establish the race of that potential juror. (*People v. Evans*, 125 Ill. 2d 50, 530 N.E.2d 1360.) The court disagreed with defense counsel's insistence that Metoxen was probably Latino since he "lived right off of 26th Street." Moreover, Metoxen informed the court during *voir dire*, among other things, that a

brother had been AWOL from the Marines and that a brother had been charged with possession of controlled substances. The trial court found that defendant failed to establish any discriminatory basis for the State's challenge as to Metoxen.

The trial court concluded that there was no *prima facie* showing under *Batson*. The court noted that the jury had two blacks and that one of the alternates was a black woman. We agree with the trial court that defendant's limited claim fails to establish a *prima facie* case of discrimination. It is not unconstitutional, without more, to strike one Hispanic and one black from the jury. (*People v. Evans*, 125 Ill. 2d 50, 530 N.E.2d 1360, citing *Batson v. Kentucky*, 476 U.S. at 101, 90 L. Ed. 2d at 91, 106 S. Ct. at 1725.) The trial court's determination that no purposeful discrimination occurred is not against the manifest weight of the evidence.

In regard to the sixth amendment argument, defendant maintains that he was denied his right to a fair–cross-section jury. However, that right does not apply at the petit jury stage. *Buchanan v. Kentucky* (1987), 483 U.S. 402, 97 L. Ed. 2d 336, 107 S. Ct. 2906; *People v. Crowder* (1987), 161 Ill. App. 3d 1009, 1013, 515 N.E.2d 783.

■ Defendant next contends that the jury was improperly instructed as to criminal sexual assault because the instruction omitted any reference to intent. Defendant failed to object at trial and thus has waived the issue on review. (*People v. Tannenbaum* (1980), 82 Ill. 2d 177, 415 N.E.2d 1027; *People v. Anderson* (1981), 93 Ill. App. 3d 646, 653, 417 N.E.2d 663.) Moreover, standard Illinois Pattern Jury Instructions, Criminal, Nos. 11.26, 11.29, 11.31, and 11.32 (2d ed. 1981) were given, setting forth the elements of the criminal sexual assault statute. (Ill. Rev. Stat. 1987, ch. 38, par. 12—13.) In addition, acts of sexual penetration involve general intent and do not require an allegation of a specific mental state from the nature of the act. *People v. Gold* (1967), 38 Ill. 2d 510, 516, 232 N.E.2d 702; *People v. Ortiz* (1987), 155 Ill. App. 3d 786, 792, 508 N.E.2d 490.

■ Defendant also complains that the trial court failed to *sua sponte* give a limiting instruction as to the mother's prior inconsistent statements made to Whaley at the police station about her knowledge of the sexual relations between her husband and her daughter. Defendant failed to request such an instruction and thus has waived the issue. *People v. Gacho* (1988), 122 Ill. 2d 221, 252, 522 N.E.2d 1146.

■ Finally, defendant lists various allegedly improper factors considered by the court when sentencing him. A trial court's sentencing determination will not be disturbed absent an abuse of discretion.

(*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) Defendant contends that the trial court abused its discretion when it improperly considered "the very facts of this offense." The court may consider the seriousness of the offense. We also find it was not improper to consider defendant's denial of guilt as it bears on his rehabilitation. (*People v. Ward* (1986), 113 Ill. 2d 516, 499 N.E.2d 422; *People v. Speed* (1984), 129 Ill. App. 3d 348, 349, 472 N.E.2d 572.) The court could also properly consider defendant's continued unemployment. *People v. Birge* (1985), 137 Ill. App. 3d 781, 792, 485 N.E.2d 37.

Defendant argues that the court improperly stated that defendant was not remorseful. The observation was accurate. Defendant's only reference to remorse concerned his regret that he faced a prison sentence.

The trial court did not abuse its discretion in refusing to grant probation to defendant and did not abuse its discretion in sentencing defendant to four years' imprisonment.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

FREEMAN, P.J., and WHITE, J., concur.