THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MATTHEW FRYER, Defendant-Appellant.

First District (6th Division)   No. 1—89—1774

Opinion filed May 28, 1993.—Rehearing denied July 9, 1993.

Rita A. Fry, Public Defender, of Chicago (Lynn Hubanks Miller, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Eileen O'Neill, and Clare M. Wesolik, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

A jury convicted the defendant, Matthew Fryer, of aggravated criminal sexual assault, criminal sexual assault and unlawful restraint. He was sentenced to imprisonment for nine years. He first maintains that he was not proved guilty beyond a reasonable doubt.

In early 1983, the defendant moved in with the complaining witness, L.H., and her two young daughters. L.H. owned the house and she paid the bills. In 1985 L.H. and the defendant began to argue frequently. At the request of L.H. the defendant moved out sometime in 1985. On December 28, 1985, he called L.H. and asked permission to visit her. She told him that she had company and that she did not want him to come. The defendant came anyway, and he was shot by a man who was in the house with L.H.

L.H. and the defendant renewed their relationship sometime in 1986 when the defendant moved back into L.H.'s house. They planned to be married, and they obtained a marriage license. They never married, and their relationship deteriorated. In January 1988, L.H. asked

the defendant to move out of her house; he refused. On January 17, they had an argument, and the defendant went to bed. While he was sleeping, L.H. drove to a police station and returned to her home with the police, who arrested the defendant. The defendant did not live with her after this incident. She admitted that she was angry with the defendant in January 1988 and was still angry with him in April 1988.

L.H. testified that on April 15, 1988, the defendant called her at approximately 1 a.m., told her he was in the hospital, and asked her to bring him money. She refused, and the defendant told her he was "tired of suffering all by [him]self" and that it was L.H.'s "turn to suffer." At approximately 7 p.m., the defendant called L.H. and told her that he hoped to sell the tires from his car, which was in her garage. He asked if he could come to her home to remove the tires; he told her that his cousin Kenneth Fryer would accompany him because Kenneth wanted to retrieve his clothes, which were also stored in L.H.'s garage.

When the defendant and Kenneth arrived at L.H.'s house, L.H. left the house with her two daughters, walked to the garage behind her house, and unlocked the overhead door on the front of the garage. The defendant asked L.H. to move her car from the garage to give him better access to the tires on his car. After L.H. moved her car, the defendant told her that someone was going to call about the tires "within a couple of minutes." L.H. and her daughters went back inside the house.

The defendant came to her back door and said that he needed L.H. to help him steer his car. She left the house alone; she was wearing a coat, a skirt that snapped up the front, a light-weight night shirt, a cardigan sweater and house slippers. She entered the garage and saw that the defendant was behind his car and Kenneth was going through some boxes near the door. The defendant showed her what appeared to be a hospital bill and told her that he was telling the truth when he called early in the morning and that he had "really needed her."

L.H. testified that the defendant told her to get into the car to steer. She noticed that there were no keys in the ignition and that Kenneth closed the overhead garage door. The defendant told L.H., "Get out of the car, bitch." L.H. left the car and asked the defendant what was wrong. He said: "I am going to hurt you. I am going to kill you *** but I am going to rape you first."

L.H. had a mace canister attached to her key chain in her coat pocket. She put her hand in her pocket, hoping to spray both the defendant and Kenneth. Kenneth reached his hand into her pocket,

pulled out the mace, and sprayed L.H. in the eye. She cried out because the mace hurt her eyes and nose, causing her nose to bleed, but the defendant told her, "Be quiet, I am going to hurt you."

She testified that the defendant told L.H. to remove her coat, and she did. He reached for an old mattress that was leaning against the garage wall and placed the mattress on the floor. He told L.H. to remove her panties and to lie on the mattress. She pleaded with the defendant and Kenneth, and offered the defendant the paycheck she received that day if he would let her leave the garage. The defendant and Kenneth refused, and L.H. removed her panties and lay on the mattress. Kenneth left the garage to retrieve a towel for L.H.'s face. She explained that she was on her back on the mattress when the defendant unsnapped the buttons on the top of her skirt, unzipped his pants, and took out his penis. The defendant got on top of L.H. and "tried to force his penis into [L.H.'s] vagina because he didn't have an erection." He did this approximately five times; his penis made contact with her vagina. He did not ejaculate. He did not strike her in the garage.

At the defendant's direction, L.H. performed fellatio on the defendant for two or three minutes, but again he did not ejaculate. When Kenneth returned with a towel, he opened the garage door "halfway." L.H. jumped up and ran out of the garage and down the alley. At this time, she was wearing her sweater, night shirt and partially unsnapped skirt.

The defendant followed her down the alley. L.H. screamed, "Help" and "Fire." She saw a man and woman in the alley and cried for them to help her. She did not know them and had not seen them in her neighborhood before. The defendant caught up with L.H., and she fell. Her skirt and sweater came off or were "grabbed off" by the defendant while she was running. As a consequence, when she fell she was wearing only the nightshirt. The defendant began beating her with his fist on the top of her head. L.H. again asked the couple in the alley to help her, and even grabbed the woman around the waist while the defendant tried to drag her away. The defendant told the couple that L.H. was his wife, that he had caught her in this state of undress "messing around," and that he was "taking [L.H.] home to take care of [her]." The defendant dragged her back toward her house, and her "legs and *** butt [were] scarred up from the way he was trying to drag [her]."

L.H. saw a police officer, and the defendant dropped her. At that point, the sleeves had been torn off her nightshirt. This nightshirt was admitted into evidence, along with the rest of her clothes that

had been recovered in the alley. The nightshirt was described as having only a loop of material at the neckline that held it on to L.H. She told an officer what had happened in the garage and specifically that she had been raped.

The police took L.H. to Holy Cross Hospital, where she was examined, treated and photographed. She had facial bruises and scratches and a swollen eye. The pictures of her legs at the hospital showed scratches she received that evening. She showed the jury a five-inch scar on her leg that came from one of these scratches. She testified that she was treated with iodine for the "sores" on her face and for scrapes, scratches, and broken skin on her buttocks.

Chicago police officer Kenneth Pisano and his partner, Officer Scott Rotkovich, were the first officers to arrive at L.H.'s house. Rotkovich ran into the alley on foot, and Pisano drove his squad car into the alley behind the house. Pisano saw the defendant chasing L.H., who was wearing no clothing below the waist and a only "little bit of clothing on the top" hanging from her neck. Pisano saw the defendant "punching" L.H. in the head with his fist. Rotkovich also saw the defendant "beating" L.H., who was screaming for help, shaking and crying, and had blood on her leg and face.

The defendant told Rotkovich, "Officer, this is my wife, I just caught her with another man, and I am kicking the shit out of her." The officers placed the defendant under arrest and examined the garage. They both testified that the defendant's car did not look mobile because the hood and trunk were open and it had at least one flat tire. A mattress, two jackets, house slippers, a mace canister holder and bloodstains were on the garage floor.

Chicago police detective Leonard Kakulka interviewed the defendant at the police station. The defendant told Kakulka that he entered L.H.'s garage by using his own key; that he, Kenneth and L.H. were able to push his car out of the garage, and that they were pushing the car back into the garage when L.H. and the defendant began yelling at each other. L.H. walked down the alley, and he and L.H. were arguing there when the police arrived.

Assistant State's Attorney Edward McCarthy also interviewed the defendant. McCarthy testified that the defendant told him that he and L.H. began arguing when she was steering the car in the garage. L.H. left the car and walked down the alley; the defendant followed her and "wasn't really beating on her, [they] were tussling." The defendant could not explain the presence of blood on the garage floor or the fact that L.H. lost most of her clothes.

L.H.'s daughter, Vashawn, who was 12 years old at the time of trial, testified that she and her sister accompanied L.H. to the garage to unlock the door. After L.H.'s car had been moved, Vashawn heard the defendant tell them that someone would call soon about the tires. A few minutes after L.H. left the house to steer the car, Kenneth came to the house requesting a towel. Vashawn heard "screaming and hollering," and when she left the house to investigate, she saw the defendant chasing her mother down the alley; She heard Kenneth say, "Look what he is doing to your mother." Vashawn ran into the house and called the police.

The defendant testified that on December 28, 1985, L.H. told him during a telephone conversation that he could visit her. When he arrived at her house, "some guy that was in [L.H.]'s house" shot him in the arm. On January 17, 1988, he went to bed after having an argument with L.H. and woke up when four police officers arrested him. He explained "that situation" was resolved before April 15, 1988. He denied that L.H. told him to move out of her house on January 16, 1988.

He did not go to L.H.'s house between January 17 and April 15, 1988. On April 15, L.H. told him that he could come to her house to remove his tires and Kenneth's clothes. The garage door was not open, and he asked L.H. to open it. He told L.H. and her daughters to go inside so that they could hear the phone if anyone called.

After first trying to remove the tires while the car was in the garage, the defendant and Kenneth decided they should move the defendant's car out of the garage to obtain better access to all four tires. The defendant placed the mattress on the floor of the garage. The mattress had been leaning against the wall next to his car and was in his way when he tried to remove the tires.

The defendant and Kenneth determined that they both needed to push the car while someone else steered it out of the garage; he asked L.H. to steer. The defendant did not have keys to the car; he climbed under the car and moved the gear shift. L.H. removed her coat when she climbed into the car to steer. He denied telling Kakulka that they pushed the car out of the garage. The defendant began yelling at L.H. because she was steering incorrectly. L.H. got out of the car and yelled at the defendant. Kenneth tried to calm both the defendant and L.H., but L.H. reached into her pocket; Kenneth grabbed her hand, and the mace discharged. The defendant told Kenneth to get L.H. a towel because the mace was in her eyes.

After Kenneth left to get a towel, the defendant tried to calm L.H. because "she was hysterical, just going crazy." Kenneth re-

turned with the towel, but L.H. ran out of the garage and down the alley. The defendant followed her down the alley and tried to calm L.H. by talking to her. He was trying to calm her when he picked her up from the ground. She was very upset, yelled at him, scratched him, and hit him several times. He became angry and hit L.H.; they were hitting each other when the police arrived. He denied telling anyone that she was his wife or that he caught her with another man. He denied that he ever removed her clothes. He did not know how she lost her clothes, but later he said they fell off while she was in the alley. He denied being on the mattress with L.H. and specifically denied having oral or vaginal sex with her.

The defendant argues that there was insufficient proof of criminal sexual assault and aggravated criminal sexual assault. A defendant commits criminal sexual assault if he "commits an act of sexual penetration by the use of force or threat of force." (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1).) The term "sexual penetration" means "any contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person." (Ill. Rev. Stat. 1987, ch. 38, par. 12—12(f).) The terms "force or threat of force" mean:

> "the use of force or violence, or the threat of force or violence, including but not limited to ***
>
> threat[s] to use force or violence on the victim *** [when] the victim under the circumstances reasonably believes that the accused had the ability to execute that threat; or
>
> when the accused has overcome the victim by use of *** physical confinement." (Ill. Rev. Stat. 1987, ch. 38, par. 12—12(d).)

A defendant commits aggravated criminal sexual assault if he commits criminal sexual assault and "cause[s] bodily harm to the victim." Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(2).

■ The defendant first argues there was insufficient evidence to show sexual penetration because there was no medical evidence. The defendant's argument is untenable. It has been expressly rejected in *People v. Diaz* (1990), 201 Ill. App. 3d 830, 558 N.E.2d 1363, and *People v. Allman* (1989), 180 Ill. App. 3d 396, 535 N.E.2d 1097.

The defendant also argues that there was insufficient evidence to show he used or threatened to use force against L.H. because the defendant did not hit L.H. before the acts of vaginal and oral sex occurred. The defendant's argument ignores several facts: L.H. was closed in a garage with two men after one of them threatened her earlier that day; she was told that she would be killed and raped; and she was unsuccessful in verbal efforts to persuade the defendant to

stop. "If circumstances show resistance to be futile \*\*\* or if the victim is overcome by superior strength or fear, useless or foolhardy acts of resistance are not required." (*People v. Bolton* (1990), 207 Ill. App. 3d 681, 686, 566 N.E.2d 348, 351; see also *People v. Morgan* (1986), 112 Ill. 2d 111, 492 N.E.2d 1303.) The defendant also ignores the evidence that Kenneth sprayed mace in L.H's eyes. Contrary to the defendant's argument, he was accountable for the actions of Kenneth.

■ We disagree with the defendant's argument that we may not consider the injuries inflicted on L.H. by the defendant after the sex acts. In *People v. Colley* (1989), 188 Ill. App. 3d 817, 544 N.E.2d 812, the victim was awakened during the night and found the defendant standing naked over her bed. He told her of his intent to have sexual intercourse with her and forced her to have vaginal intercourse and to engage in oral sex. He accompanied her to the bathroom, hit her in the eye and told her he would kill her if she did not give him some money. He cut her on the neck and chin with a pocketknife. He was convicted of aggravated criminal sexual assault by causing bodily harm. The defendant argued that the prosecution failed to prove aggravated criminal sexual assault because the victim's bodily injuries were committed too long after the sexual acts were completed to be considered part of the same course of conduct. In affirming, the appellate court explained:

> "Here, the evidence showed that the defendant stabbed the victim soon after the sexual acts were completed. Under the instant circumstances, we will not draw a bright line between the ending of the sexual acts and bodily harm occurring afterward, as that would defeat the statutory purpose of protecting victims from sex offenders. We find that the stab wounds occurred sufficiently close in time to the sexual acts that they can be said to have been committed during the course of the sexual assault." *Colley*, 188 Ill. App. 3d at 820.

See also *People v. White* (1990), 195 Ill. App. 3d 463, 552 N.E.2d 410.

In this case the physical injuries that the defendant inflicted on L.H. in the alley were sufficiently close to the sexual assault so that the injuries could be found to have been committed during the commission of the sexual assault. She suffered bruises on the face and multiple scratches on her buttocks and legs. One of the injuries to her leg left her with a five-inch scar. Finally, even if we were to accept the defendant's argument on this point, we would still find that L.H. suffered bodily harm as a result of being sprayed by mace; the spraying took place before the sex acts occurred.

■ The defendant next contends that the indictment was defective because it did not allege a specific mental state. The defendant concedes that his argument has been rejected by several courts including this division in *People v. Wilder* (1991), 219 Ill. App. 3d 437, 579 N.E.2d 948. In *Wilder*, the defendant claimed that his aggravated criminal sexual assault conviction could not stand because the information charging him did not list any mental state. The information listed the applicable statute and stated only that the defendant "committed an act of sexual penetration upon [T.R.], to wit: contact between [defendant's] penis and [T.R.'s] anus." (*Wilder*, 219 Ill. App. 3d at 438.) The court noted that Illinois law was settled in this area and that the crime of aggravated criminal sexual assault is a general intent crime and does not require the allegation of a specific mental state, citing *People v. Leonard* (1988), 171 Ill. App. 3d 380, 526 N.E.2d 397. (*Cf. People v. Jimenez* (1989), 191 Ill. App. 3d 13, 547 N.E.2d 616 (aggravated criminal sexual statute not unconstitutional because of failure to specify a particular mental state).) We adhere to the views expressed in *Wilder*.

■ The defendant also alleges that the instructions were improper because they did not include a mental state. Because we have concluded that the defendant's argument must be rejected, we need not address the State's claim that the defendant has waived this argument by his failure to object to the instructions at any time in the trial court. Three cases have held that, in prosecutions for aggravated criminal sexual assault, the instructions need not set forth a specific mental state: *People v. Avila* (1989), 180 Ill. App. 3d 345, 535 N.E.2d 1027; *People v. Leonard* (1988), 171 Ill. App. 3d 380, 526 N.E.2d 397; and *People v. Ortiz* (1987), 155 Ill. App. 3d 786, 508 N.E.2d 490.

The defendant next maintains that the prosecutor violated the constitutional equal protection clause when she used peremptory challenges against two black venirepersons. During *voir dire* the State used seven peremptory challenges; three of these challenges were exercised against blacks, but only two are relevant to this appeal. First, the State struck two blacks from one panel and then asked to "back strike" another black venireperson who had been questioned and accepted by both parties earlier. The defense objected. The trial judge then asked the assistant State's Attorney: "Okay, why are you taking him off *** I want you to give an explanation."

The assistant State's Attorney said that she "backstruck" juror Mose Freeman because of his facial "gestures" and expressions after he was questioned during the time that Freeman was watching the questioning of other venirepersons. Her co-counsel had brought these

gestures to her attention while she was questioning a later panel of potential jurors. The prosecutor also stated that juror James Harris was being excused because he was unemployed and was unwilling to make eye contact with the prosecutors. Harris wore "sunglasses," which made the prosecutors "unable to see exactly what he was doing."

The trial judge remarked that two blacks had been accepted as jurors "thus far" and that the victim and defendant were black. The judge explained that "at this juncture [he was] not going to intervene," but would "watch closely henceforth and hereafter." Four blacks ultimately were seated as jurors.

The defendant contends that the exclusion of Harris and Freeman from the jury was against his right to equal protection based on *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Initially, we reject the State's claim that the defendant waived any error in the jury selection by not listing this issue in his motion for a new trial. *People v. Batchelor* (1990), 202 Ill. App. 3d 316, 559 N.E.2d 948.

To rebut an inference of discrimination under *Batson*, the State "must come forward with race-neutral reasons for excluding the black venire[persons]." (*People v. McDonald* (1988), 125 Ill. 2d 182, 198, 530 N.E.2d 1351.) The reasons "need not rise to the level justifying exercise of a challenge for cause" (*People v. Mack* (1989), 128 Ill. 2d 231, 239, 538 N.E.2d 1107), but must demonstrate "a neutral explanation related to the particular case to be tried" (*Batchelor*, 202 Ill. App. 3d at 323). Two "traits which may justify a peremptory challenge" are "courtroom demeanor, employment status and type of job." (*Batchelor*, 202 Ill. App. 3d at 323.) A trial judge's determination, based "largely *** on *** credibility," that the prosecutor's reasons are neutral and not racially motivated is entitled to "great deference." (*Mack*, 128 Ill. 2d at 238.) The trial judge's determination will not be overturned on review unless it is found to be against the manifest weight of the evidence. (*McDonald*, 125 Ill. 2d at 199.) In this court, therefore, it is the defendant's burden to convince us that the trial judge's determination was against the manifest weight of the evidence.

We must take the issue as it has been presented to us. The defendant's sole argument is that, while demeanor of a venireperson may justify a State challenge, that demeanor must also have been observed by the trial judge. The defense does not cite any authority for the argument that the trial judge must observe the prospective juror's demeanor but relies on *People v. Baisten* (1990), 203 Ill. App. 3d 64,

560 N.E.2d 1060. In *Baisten,* the State explained that it challenged a black venireperson because he was similar in age to the defendant and "continued looking at defendant, while avoiding looking at the judge." (203 Ill. App. 3d at 79.) The appellate court found that the State's citation of demeanor was a racially neutral reason for the challenge, and noted that the trial judge said the juror would look at the judge only when asked a direct question. The court did not say that the record must show that the trial judge agreed with the State's interpretation of the juror's demeanor.

The *Baisten* court followed *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453, a case on which the State relies in this court. The *Young* prosecutor explained that he challenged a black potential juror because of his "hesitation with response to certain questions and his demeanor in answering the questions." (128 Ill. 2d at 19.) *The trial judge did not comment on the juror's demeanor.* The defendant contended that demeanor could "be used as subterfuge for excusing the juror solely on the basis of race." (*Young,* 128 Ill. 2d at 20.) The *Young* court stated that "[t]here is appeal to the [defendant's] contention, but demeanor *** has anciently been regarded as being of significance" and "traditionally been a factor of importance in jury selection." (*Young,* 128 Ill. 2d at 20.) Also, "[c]ourts have held that a juror's demeanor may constitute a legitimate and racially neutral reason for excusing him." (*Young,* 128 Ill. 2d at 20.) The *Young* court noted that the trial judge was in the best position to observe a potential juror's demeanor and to "evaluate prospective applications for the exercise of peremptory challenges," and refused to reverse the trial judge's finding that the State's expressed reason was legitimate and nondiscriminatory.

The State also relies on *People v. Mack* (1989), 128 Ill. 2d 231, 538 N.E.2d 1107. We find *Mack* particularly significant. The defendant was convicted of murder, but the supreme court reversed his conviction and remanded the case for a *Batson* hearing. The *Batson* hearing was conducted by a judge other than the judge who presided at the trial. The prosecutors explained at the *Batson* hearing that they had excused some jurors because of the jurors' demeanor. The hearing judge, *who had not observed the demeanor of the jurors,* accepted the prosecutors' explanation and the supreme court affirmed, holding that the trial judge's finding that the State had adequately explained the reasons for challenging jurors was not against the manifest weight of the evidence. We judge, therefore, that it is not required that the record show that the trial judge noted the same demeanor of a juror that is later questioned by the State.

■ In this case, the trial judge conducted most of the *voir dire* examination of the jurors; he noted that the defendant and the victim were both black; he saw that two blacks had already been selected when the defendant first objected and that ultimately four blacks were selected; and he saw that the State excused four white jurors. His remarks, including his cautionary remarks to the prosecutors, show a conscientious effort on his part to insure that the jury was properly selected. He was in the best position to judge the credibility of the prosecutors. For a reviewing court, lacking the benefit of all the things the trial judge observed, to undo the efforts of the trial judge would be the height of unfairness. The defendant has fallen far short of a showing that the judge's findings were against the manifest weight of the evidence. The case cited by the defendant, *People v. Boston* (1991), 224 Ill. App. 3d 218, 586 N.E.2d 326, does not assist the defendant's position. In that case the appellate court found that the record showed that the trial judge failed to closely scrutinize the State's explanations. The record in this case is to the contrary.

The defendant also maintains that his sixth amendment right to compulsory process was violated by a plea agreement between the State and his codefendant, Kenneth Fryer.

Before jury selection began both for the defendant and Kenneth Fryer, the State presented a plea agreement it had reached with Kenneth Fryer. The prosecutor told the judge that under the agreement Kenneth would plead to the charge of unlawful restraint and would not testify for either side, and that if Kenneth testified for the defense, the State would not dismiss the Class X charges. He also told the judge that the defendant's attorney had subpoenaed Kenneth which, "would be against [Kenneth's] 5th Amendment rights" because the State was not going to dismiss the Class X charges until after the defendant's trial. He said that either he or Kenneth's lawyer would move to quash Kenneth's subpoena. The defendant's attorney objected to the agreement and said, "They are depriving [the defendant] of his 6th Amendment right to put on a defense." Kenneth's attorney moved to quash the subpoena, explaining that Kenneth intended to "plead the Fifth Amendment if he is called to the stand for any questions whatsoever." The judge quashed the subpoena, accepted the agreement between Kenneth and the State and entered Kenneth's plea; the judge explained to the defendant's attorney, "[Kenneth] does have that right, if he feels he has worked out a better deal, you know, that is his prerogative."

The judge heard stipulated evidence in chambers which included a detailed summary of L.H's testimony. The defendant and his attorney

were present. Both Kenneth and his attorney specifically agreed that L.H's testimony was accurate. The defendant's attorney did not renew his request that Kenneth be called as a defense witness after Kenneth had pleaded guilty.

●6 We find no denial of the defendant's sixth amendment rights of compulsory process under the particular facts of this case. We do *not* hold, however, that any plea agreement which bars a witness from testifying for a defendant may never be a denial of a defendant's right under the sixth amendment. It is one thing to condition a plea agreement on a witness' abstaining from testifying falsely; it may be quite another thing to condition a plea agreement on the witness' abstaining from testifying at all.

We also wish to make our position clear on the right of Kenneth to invoke the fifth amendment. It is true that a witness called by a defendant has the right to refuse to testify on the ground that his answers may incriminate him. (*People v. Loya* (1980), 90 Ill. App. 3d 1078, 413 N.E.2d 1361.) But it is not true that a witness' invocation of his fifth amendment rights precludes any further examination by the court to determine whether the witness has reasonable cause to believe he might subject himself to prosecution if he answers. (*People v. Redd* (1990), 135 Ill. 2d 252, 553 N.E.2d 316.) We make this observation because we are not certain that Kenneth could properly have invoked his fifth amendment rights *after* he had entered his plea of guilty. The issue has not been raised, and we do not decide here whether he did or did not have the right to invoke his fifth amendment rights after he had entered his plea of guilty.

We hold that the defendant has failed to establish a denial of his sixth amendment right because he has failed to show how Kenneth's testimony could have assisted him. There is no showing in the record, for example, that Kenneth had previously made statements that would have been helpful to the defendant. Most important, in proceedings which were commendably thorough, in response to the judge's question, Kenneth said that the stipulated testimony of L.H., which was in substance the same as her trial testimony, was true. Consequently, the record establishes that Kenneth's testimony would have been harmful rather than helpful to the defendant. The compulsory process clause is not violated unless a defendant is able to show how the missing testimony would have been both material and favorable to his defense. (*United States v. Valenzuela-Bernal* (1982), 458 U.S. 858, 73 L. Ed. 2d 1193, 102 S. Ct. 3440.) In *People v. Lego* (1987), 116 Ill. 2d 323, 507 N.E.2d 800, the supreme court held that the quashing of 89 pretrial subpoenas was proper because the defendant had not

shown that "the witnesses desired were material to his defense, and their testimonies relevant." (*Lego*, 116 Ill. 2d at 337.) Under the circumstances before us, the judge did not err in quashing Kenneth's subpoena. The case cited by the defendant, *People v. King* (1993), 154 Ill. 2d 217, is not in point. In that case, the supreme court reversed the conviction because the testimony of the codefendant would have exonerated the defendant and because the trial judge unduly admonished the codefendant of possible adverse consequences to him if he testified for the defendant.

The defendant also raises a compulsory process claim regarding the judge's ruling that a defense witness could not testify. After a lunch break on the first day of trial, while L.H. was still testifying, the defendant's attorney filed an amended answer to discovery that listed Annette Fryer, the defendant's mother, as a witness. This was the first time the defense indicated it would call Annette, although it had filed other answers to discovery on three previous occasions. The State objected to her testimony on the grounds that the notice came too late and that the witness had been in court during the testimony of L.H. and during the pretrial discussions and pretrial arguments.

The judge called Annette to testify. She said that she entered the courtroom "before lunch," sat on the courtroom benches and was present for "about four or five minutes" before the lunch break. She said she was not present for opening statements but heard "about two minutes" of L.H.'s testimony. She had known about the charges against her son "for some time" and had lived with her son "on and off" for the past year. She denied that she had been interviewed regarding the case, but the defendant's attorney interrupted her and told the judge that the witness was confused about what constitutes an "interview"; he said that he had interviewed her during lunch. He explained, "She was up in my office [during the lunch break] *** and I was talking to her, and all of a sudden, she blurted out some things I had no knowledge of and that is why I amended my answer." Another defense attorney noted that during lunch, Annette told them that one week after the April 15, 1988, incident, she had a telephone conversation with L.H. in which L.H. told her that the defendant hit her, but "did not touch her in that way; 'in that way' was L.H.'s phrase and it meant 'sexually.' "

The State called L.H., who testified that she saw Annette enter the courtroom while she was testifying before the jury. Annette first sat on a bench on L.H.'s right side and then moved across the aisle and sat behind the defense table. She said that Annette was present for "a good thirty minutes of [L.H.'s] testimony."

Two of the assistant State's Attorneys prosecuting the case were permitted to testify without withdrawing from the case because the judge found that the question "could not have been foreseen before." One prosecutor testified that she saw Annette in the courtroom for "at least 30 minutes" during the direct examination of L.H. Another prosecutor testified that Annette was present in the courtroom for "at least 15 minutes" during the examination of L.H.

The defense called Latina Fryer, the defendant's sister, who testified that she came to court with her mother and that they heard L.H. testify for "about 5 or 10 minutes." She admitted that she was present in the courtroom while her mother, L.H. and the assistant State's Attorneys testified on the question of whether Annette should be permitted to testify. She said that she was with Annette and the defendant's attorneys during lunch break when Annette told the attorneys about her telephone conversation with L.H. She also testified that her mother told her about the telephone conversation before the trial began. She spoke with the defendant after her mother told her this information, but she never told the defendant about L.H.'s statement because "it never came up."

The judge ruled that Annette could not testify. In substance, he based his ruling on the credibility of the witnesses. He found that Latina Fryer's testimony contradicted her mother's and said that he did not believe Annette. He specifically found that Annette was in the courtroom during L.H.'s testimony for "an extended period of time, *** and that after hearing the testimony of [L.H.], it was then that [Annette] fabricated her statement." He relied upon *Taylor v. Illinois* (1988), 484 U.S. 400, 98 L. Ed. 2d 798, 108 S. Ct. 646, in which the Supreme Court upheld the constitutionality of Illinois Supreme Court Rules 413 and 415 (134 Ill. 2d Rules 413, 415), which provide that the defense must disclose all witnesses before trial and that, in some cases, a trial judge may bar the witness from testifying as a sanction for nondisclosure. The court affirmed the trial judge, who had found "a blatent [*sic*] violation of the discovery rules" and barred the witness from testifying. *Taylor*, 484 U.S. at 405, 98 L. Ed. 2d at 808, 108 S. Ct. at 651.

■ The Illinois Supreme Court similarly found that a trial judge did not abuse his discretion by barring a witness from testifying when the witness had not been disclosed before trial. (*People v. Nevitt* (1990), 135 Ill. 2d 423, 553 N.E.2d 368.) We conclude that the judge's preclusion order was not an abuse of discretion and did not violate the sixth amendment.

The defendant's last claim of error is that the judge unduly restricted his cross-examination of L.H. During opening statement, the defendant's attorney told the jury that L.H. was an "ex-lover who is angry." He said that the evidence would show what happened on January 17, 1988; he described it as a "crucial date."

Before cross-examination of L.H. began, the assistant State's Attorney moved to bar the defense from eliciting from L.H. the disposition of the court proceedings that arose out of the events between L.H. and the defendant on January 17. She told the judge that L.H. had the defendant arrested; a shotgun was alleged to be in his possession; and the defendant was found not guilty of an unspecified charge after a bench trial. She contended that the evidence of the disposition of the case was irrelevant. The defendant's attorney told the judge that the evidence would show that L.H.'s motive was to get at the defendant one way or another; if she could not get him for the January 17 occurrence, she would make up a sexual assault charge against him. The judge allowed the State's motion.

■ Contrary to the State's argument, this assignment of error was not waived. However, we do not believe that the defendant has established any manifest prejudice by the judge's exercise of his discretion in limiting the cross-examination of L.H. Both L.H. and the defendant testified that she was angry and had him arrested on January 17. L.H. admitted on cross-examination and redirect examination that she was still angry with Fryer in April 1988. There was considerable testimony from both the defendant and L.H. regarding their failed romantic relationship. In determining whether there is a constitutional sufficiency of cross-examination allowed in a criminal case, a reviewing court looks not only to what the defendant was prohibited from doing, but to what the defendant was permitted to do. (*People v. Maldonado* (1989), 193 Ill. App. 3d 1062, 550 N.E.2d 1011.) The defendant was able to give the jury sufficient information about L.H.'s bias against him. Therefore, the limit on the defendant's cross-examination did not result in manifest prejudice to him and was not an abuse of the trial judge's discretion. See *People v. Edwards* (1991), 218 Ill. App. 3d 184, 577 N.E.2d 1250; *People v. Newman* (1984), 123 Ill. App. 3d 43, 462 N.E.2d 731.

For all these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

RAKOWSKI and GIANNIS, JJ., concur.