2022 IL App (3d) 210091

NO. 3-21-0091

IN THE APPELLATE COURT

OF ILLINOIS

THIRD DISTRICT

FILED
January 21, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE COUNTY OF PEORIA, ILLINOIS, and THE CITY OF PEORIA, ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellees, | ) | Peoria County |
| v. | ) | No. 20OV428 |
| JOSEPH E. COUTURE, | ) | |
| Defendant-Appellant. | ) | Honorable |
| | ) | Kevin W. Lyons, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Presiding Justice Knecht and Justice Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1 Peoria County filed an ordinance-violation complaint against the defendant, Joseph E. Couture. The City of Peoria joined the action as a second plaintiff. In the ensuing bench trial, the circuit court of Peoria County found that Couture had violated three provisions of a Peoria ordinance forbidding the possession, within city limits, of a "nuisance animal." Peoria City Code § 4-22(a)(1), (2), (6) (amended Jan. 28, 2020). The court imposed a fine on Couture. He appeals, and in his appeal he makes four arguments.

¶ 2 First, Couture argues that the circuit court erred by denying his motion to dismiss the ordinance-violation complaint, with prejudice, pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2020)) and by granting the county's motion to amend the complaint. We conclude that the denial of the section 2-619 motion merged into the

judgment, making the denial unreviewable. Also, because it is the policy of Illinois law to freely and liberally allow amendments to pleadings so that cases will be decided on their merits instead of on pleading technicalities, we find no abuse of discretion in the court's decision to allow the amendment of the complaint.

¶ 3        Second, Couture contends that the circuit court erred by finding that he had violated the three subsections of the municipal code (Peoria City Code § 4-22(a)(1), (2), (6) (amended Jan. 28, 2020)). We partly agree with this contention. The finding against Couture on section 4-22(a)(6) is against the manifest weight of the evidence. We are unable to say the same, however, about the findings on section 4-22(a)(1) and (2), which we accordingly affirm.

¶ 4        Third, Couture maintains that the circuit court erred by granting a motion *in limine* by the plaintiffs. We hold that he has forfeited this issue by failing to follow up with an offer of proof in the bench trial.

¶ 5        Fourth, Couture argues that, if our decision requires further proceedings on remand, the matter should be assigned to a different judge. We see no need, however, for a remand.

¶ 6        Therefore, we reverse the finding against Couture on section 4-22(a)(6) of the municipal code (*id.* § 4-22(a)(6)), but we otherwise affirm the judgment.

¶ 7                                    I. BACKGROUND

¶ 8        Couture owned Unit 810 in the condominium building at 401 Southwest Water Street in Peoria, Illinois. Michael J. Salmon owned Unit 806. On the evening of May 6, 2020, in the eighth-floor elevator lobby of the building, Couture's dog bit Salmon's dog, killing it.

¶ 9        On May 7, 2020, a short-form ordinance-violation complaint, or ticket, was filed in the circuit court as Peoria County case No. 20-OV-227. According to the caption of the ticket, Peoria County was the plaintiff. (It was a form in which "County of Peoria" was preprinted as the

plaintiff.) The ticket charged that on May 7, 2020, Couture violated section 5-9(a)(6) of the Peoria County Code (Peoria County Code § 5-9(a)(6) (amended Oct. 10, 2019)) by possessing an animal that created a nuisance.

¶ 10        On August 28, 2020, Couture moved for a summary judgment in his favor (see 735 ILCS 5/2-1005(b) (West 2020)). The motion gave four reasons for this requested relief. First, since Couture had an undivided percentage ownership interest in the eighth-floor elevator lobby, the county could not prove that the dog bite was inflicted, in the language of section 5-9(a)(6), "off the premises of the [biting dog's] owner." Second, Salmon was the signer of the ticket, even though he was neither "an attorney representing the plaintiff" nor "a peace officer or a code enforcement officer authorized by the plaintiff to sign the charging document." See Ill. S. Ct. R. 572(a) (eff. Dec. 7, 2011). Third, as proven by an affidavit signed by Couture, the alleged date of the offense was inaccurate (it should have been May 6, 2020, instead of May 7, 2020). Fourth, the ticket accused Couture of "city violations" while citing the Peoria County Code instead of the Peoria City Code.

¶ 11        On September 11, 2020, the circuit court declined to rule on the merits of Couture's motion for summary judgment, instead dismissing the ticket for noncompliance with the signature requirement of Rule 572(a).

¶ 12        On September 15, 2020, an officer of Peoria County Animal Protection Services (Animal Protection), Keith Mallow, signed a new ordinance-violation complaint, which was docketed as Peoria County case No. 20-OV-428. This complaint alleged that on May 7, 2020, at 401 Southwest Water Street in Peoria, Couture violated section 5-9(a)(1), (2), and (6) of the Peoria County Code (Peoria County Code § 5-9(a)(1), (2), (6) (amended Oct. 10, 2019)) by permitting his dog to become a nuisance.

¶ 13        On November 10, 2020, Couture filed a document titled "Defendant's Motion to Dismiss and for Rule 137 Sanctions." In this motion, he requested two forms of relief. First, pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2020)), he argued that the case should be dismissed with prejudice because, under section 1-3 of the county code (Peoria County Code § 1-3 (adopted 1969)), the county code "appl[ied] only to all acts performed within the unincorporated areas of the county" (to quote from section 1-3). The motion argued, further, that the dismissal should be with prejudice "because the inapplicability of the [county code] mean[t] that *there [were] no facts the County [could] prove* that would entitle them to judgment." (Emphasis in original.)

¶ 14        Second, pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018), the motion sought sanctions against the county because (1) in this second version of the complaint, the county got the date of the offense wrong again; (2) the complaint cited the county code, which, it was clear from the face of the complaint, was inapplicable; and (3) in a vexatious effort to collect three times the lawful amount from Couture, the county asserted three violations of the county code.

¶ 15        On December 3, 2020, the county filed a response to Couture's motion for dismissal and for sanctions. The county pointed out that, in 2018, Peoria County and the City of Peoria entered into an intergovernmental cooperation agreement, as the constitution (Ill. Const. 1970, art. VII) and the Intergovernmental Cooperation Act (5 ILCS 220/1 *et seq.* (West 2018)) allowed them to do. In the agreement, which was attached to the county's response as exhibit A, the parties recited that the county operated Animal Protection and that the city was "in need of an animal control program." The county agreed to assume the duty of "respond[ing] to calls and issu[ing] ordinance violation tickets to owners for animals found to be in violation of the CITY's animal control ordinance." Not only would the county "retain all fines," but the city would pay the county

certain amounts to cover the cost of providing animal control services in the city. In addition, the city agreed as follows:

"B. The CITY shall designate the COUNTY, [Animal Protection], and the City of Peoria as the CITY's authorized delegates for purpose of enforcing the CITY's Animal Control Ordinance.

C. The CITY shall adopt the COUNTY's or the City of Peoria's animal control ordinance as the CITY's ordinance for purposes of enforcement.

D. The CITY acknowledges that [Animal Protection's] Animal Control Officers shall have full authority to enforce the City's Animal Control Ordinance within the City limits."

¶ 16　　The county further pointed out, in its response to Couture's motion for dismissal, that "the County Code section dealing with animal nuisance read[ ] almost verbatim to the City Code involving animal causing a nuisance." The county code provisions read as follows:

"(a) No person owning, possessing or harboring any animal within the county shall permit said animal to become a nuisance. An animal, other than a dog trained for law enforcement in the performance of its duty, shall be considered a nuisance if said animal:

(1) Substantially damages property other than the owner's.

(2) Causes unsanitary, dangerous or unreasonably offensive conditions. ***

* * *

(6) Chases, molests, attacks, bites, or interferes with other domestic animals while off the premises of the owner." Peoria County Code § 5-9(a)(1), (2), (6) (amended Oct. 10, 2019).

By comparison, the corresponding provisions of the Peoria City Code read as follows:

"(a) No person shall own, possess, or harbor a nuisance animal within the city. An animal, other than a dog trained for law enforcement in the performance of its duty, shall be considered a nuisance if such animal:

(1) Damages real or personal property other than the owner's.

(2) Causes unsanitary, dangerous or unreasonably offensive conditions.

* * *

(6) Chases, molests, attacks, bites or interferes with other animals while off the premises of the owner." Peoria City Code § 4-22(a)(1), (2), (6) (amended Jan. 28, 2020).

¶ 17        Thus, the county observed, "[b]oth the County and the City ordinances contain[ed] the same language, just in two different Codes and different labeling numbers." The county argued that, "[b]ecause authority has been given to [Animal Protection] by the City to enforce City and County codes in the City, [Couture's] argument [in his motion for dismissal] must fail."

¶ 18        As for Couture's request for the imposition of sanctions, the county argued it ought to be allowed to plead as many counts as the evidence warranted. The county explained that the date of the offense was merely a trivial clerical error, which the county requested to correct by amendment.

¶ 19          On December 17, 2020, Judge Lyons held a hearing on Couture's motion for dismissal under section 2-619(a)(9) and for Rule 137 sanctions. Defense counsel argued that, although under the intergovernmental cooperation agreement Animal Protection could enforce the *city's* animal control ordinance within the city, it could not enforce the *county's* animal control ordinances within the city.

¶ 20          The circuit court asked defense counsel, "Don't they kind of mirror each other?" Defense counsel conceded that "[t]hey do," but he insisted that even though "the language may be the same," the claim had to be brought under the city ordinance, in the name of the city, instead of under the county ordinance, in the name of the county. "They're just doing this wrong," defense counsel argued, "and really all they had to do was possibly bring a claim under the City Ordinance, but they didn't."

¶ 21          "Well, what if I said for them to do that?" the circuit court asked. Defense counsel answered:

"MR. AHMAD: Well, you would have to dismiss the Peoria County with prejudice because Peoria County cannot bring the claim. It would have to be a City of Peoria claim brought by these attorneys perhaps.

THE COURT: What if I said well, you know, if I were you, maybe you should bring this under the title of the City or cross out the words on the top and write in City or something and then they dismiss on their own this one and go on the other one? Aren't we rowing different boats, but trying to get to the same place?"

Defense counsel believed that, if there were only one plaintiff to begin with, a different plaintiff could not be substituted for that plaintiff. Instead, according to defense counsel, the current

plaintiff's case would have to be dismissed with prejudice, and a different plaintiff, the correct one, would have to file a new action.

¶ 22    The circuit court disagreed that a dismissal with prejudice and the initiation of a new case would be necessary. Also, because Couture was present when the incident happened and presumably knew what day it was when the incident happened, the court did not see how he could be prejudiced if the complaint said May 7, 2020, instead of May 6, 2020. Therefore, the court orally denied Couture's motion for dismissal.

¶ 23    The circuit court then asked, "What else do we need to do?" The assistant state's attorney replied:

"MR. COLEMAN: Just my request to amend the ticket, [Y]our Honor, from the 7th to the 6th.

THE COURT: Okay. We'll do that, and we'll just do it by interlineation and write it on there. ***

MR. COLEMAN: Your Honor, I do have a question. Should we amend the code to the City Code? They have access with both of them instead of the County. Is that—

THE COURT: Are they the—they're the same words; aren't they?

MR. COLEMAN: Yeah. They're essentially the same words pretty much verbatim so—

THE COURT: Why don't we—why don't you put both of them are on there.

MR. COLEMAN: Okay."

¶ 24    The ordinance-violation complaint, as amended, has four handwritten changes, each change initialed by "RC" (presumably Reginald Coleman, the assistant state's attorney who was in attendance at this hearing). First, "Amended" is written above the preprinted title "Short Form Complaint." Second, in the caption, the phrase "& City of Peoria, IL," is written below the preprinted plaintiff, "County of Peoria." Third, "5-7-20" is crossed out, and "5-6-20" is written above it. Fourth, "City Violations" is written and underlined, and underneath, "4-22(a)1," "4-22(a)2," and "4-22(a)6" are written.

¶ 25    On February 18, 2021, the day before the bench trial, defense counsel e-mailed the assistant state's attorney a list of the witnesses whom the defense expected to call. According to the e-mail, Jennifer Sacco was "expected to testify regarding her evaluation of Mr. Couture's dog." Sally Monroe and Sandy Velde were "expected to testify regarding the disposition and behavior of Mr. Salmon's dogs and Mr. Couture's dog." Marissa Howard was "expected to testify regarding the disposition and behavior of Mr. Couture's dog."

¶ 26    That same day, the assistant state's attorney responded with a motion *in limine*, which sought to bar canine propensity evidence. The motion argued that "[t]he propensity of either dog *** to be either aggressive or mild[-]mannered" was "not relevant to determine whether Mr. Couture's dog was a nuisance at the relevant time" and propensity was "not outlined as a yardstick for any of the subsections."

¶ 27    On February 19, 2021, after hearing arguments on the plaintiffs' motion *in limine*, the circuit court granted the motion. The court agreed that canine propensity evidence would be irrelevant. The court remarked, "[W]ith regard to testimony that that attaches to propensity, or what you're calling 'dog character,' I do not find any support that allows for that when the citation or the ordinance applied against the defendant is the one used."

¶ 28    After the granting of the motion *in limine*, the bench trial began, with Judge Lyons presiding. Salmon took the stand and testified in substance as follows. He owned two dogs. Around 10 or 10:30 p.m. on May 6, 2020, he exited his condominium unit to take his dogs out for a walk. His dogs were on leashes. While holding the leashes in his left hand, he walked to the door separating the condominium corridor from the elevator lobby. He opened the door toward him with his right hand and took a step forward into the elevator lobby, a public area. At that moment, Couture's dog bit and killed one of his dogs, which bled onto the carpet a pool about the size of a cantaloupe. The next day, on May 7, 2020, Salmon told the building manager, Rose (last name unspecified), about the bloodstain on the carpet. Within a day or two, she had the bloodstained area cleaned. The next day, however, the "shadow" of the bloodstain returned. Salmon contacted Rose again, who this time had the carpet square replaced.

¶ 29    On cross-examination, defense counsel asked Salmon:

"Q. You indicated that the carpet square where the incident took place was replaced?

A. Correct.

Q. Did you see it being replaced?

A. No.

Q. Could it have just been cleaned?

A. It was, and then the spot rose up and came back. And then I called Rose and she said she would replace the carpet itself.

Q. But you don't know if it was actually replaced?

A. I do personally because Rose is a very hard worker, and I trust when she says she's going to do something she does it.

Q. But you didn't actually see the—

A. Oh, no.

Q.—carpet being replaced?

A. I didn't see it being cleaned. I try to stay away from that area as much as I can. And when I—would walk around it or not even look down.

Q. So your assumption is the carpet was replaced, but you don't know for sure?

A. No. No, I do not know for sure. Correct."

¶ 30　　　　In the defense's case, Couture took the stand and testified substantially as follows. He owned Unit 810 in the condominium building. With that unit, he had acquired a percentage ownership of all the common elements of the condominium portion of the building, including the eighth-floor elevator lobby. The circuit court admitted Couture's warranty deed into evidence. Around 10:30 p.m. on May 6, 2020, Couture took his dog outside to urinate. He then brought his dog back into the condominium building. He rode an elevator to the eighth floor. When the elevator door opened, Couture went to the door that separated the elevator lobby from the condominium corridor. Holding the leash firmly in his right hand, with no slack so that his dog was standing right next to him, Couture swiped his key on the door. With his left hand, he pushed the door halfway open. He saw that Salmon was sitting on the floor in the condominium corridor, "manipulating the leash or harness of one of [his] dogs." Salmon's other dog had a leash on, too, but Salmon was not holding that leash. Dragging its leash, Salmon's second dog advanced on Couture and his dog, barking. Couture swung his right arm behind him as far as he could, to hold his dog back, and he tried to step on the leash of Salmon's dog, to stop him. Couture was

unsuccessful. Salmon's dog got past Couture and behind him, and Couture's dog inflicted a fatal bite on Salmon's dog.

¶ 31 After hearing the evidence and the arguments, the circuit court entered a finding against Couture on section 4-22(a)(1), (2), and (6) of the city code (*id.*). The court entered a judgment, however, only on the violation of section 4-22(a)(6) and assessed against Couture a fine of $150 and court costs of $254.

¶ 32 This appeal followed.

¶ 33                              II. ANALYSIS

¶ 34 A. The Denial of the Motion for Dismissal Pursuant to Section 2-619(a)(9)

¶ 35 Illinois Supreme Court Rule 571 (eff. Dec. 7, 2011) provides that, "[e]xcept as specifically stated herein or in existing statutes, the Code of Civil Procedure [(735 ILCS 5/1-101 *et seq.* (West 2020))] shall apply in all ordinance prosecutions to which these rules apply." No statute or supreme court rule, as far as we know, specifically states that section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2020)) is inapplicable to ordinance prosecutions. We conclude, then, that section 2-619 is applicable. See *id.*

¶ 36 Pursuant to section 2-619(a)(9) (*id.* § 2-619(a)(9)), Couture moved to dismiss the ordinance-violation complaint, with prejudice, on the grounds that (1) the incident happened in Peoria and (2) the Peoria County Code, by its own terms (see Peoria County Code § 1-3 (adopted 1969)) was inapplicable to incorporated areas of Peoria County. Thus, in his motion for dismissal, Couture denied committing the offense of animal nuisance as defined by the section of the Peoria County Code cited in the complaint (Peoria County Code § 5-9(a)(1), (2), (6) (amended Oct. 10, 2019)). He argued it was ascertainable, from the face of the complaint, that he did not violate those subsections. The complaint alleged that the offense occurred at 401 Southwest Water Street in

- 12 -

Peoria, Illinois. But section 1-3 of the Peoria County Code (Peoria County Code § 1-3 (adopted 1969)) read that, "[u]nless otherwise provided[,] this Code shall apply only to all acts performed within the *unincorporated* areas of the county." (Emphasis added.)

¶ 37    Even though Peoria was an incorporated area of the county, the circuit court denied the motion for dismissal. On appeal, Couture maintains that the court thereby erred.

¶ 38    Arguably, the circuit court's denial of the motion is defensible because, given the reason for dismissal that Couture advanced, section 2-619(a)(9) was the wrong section of the Code of Civil Procedure. A section 2-619 motion admits the legal sufficiency of the complaint while raising defects or defenses outside the complaint, *i.e.*, affirmative matters, that defeat the claim. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006). Couture's contention, essentially, was that the ordinance-violation complaint was legally insufficient on its face. As he argued, all one had to do was read the complaint to ascertain that it was legally insufficient. True, one also would have to read section 1-3 of the Peoria County Code. Properly speaking, however, section 1-3 was not affirmative matter within the meaning of section 2-619(a)(9) any more than case law would have been affirmative matter. When, pursuant to section 2-615 (735 ILCS 5/2-615 (West 2020)), the court assesses the legal sufficiency of a complaint, the court considers "matters of which the court can take judicial notice." *Mt. Zion State Bank & Trust v. Consolidated Communications, Inc.*, 169 Ill. 2d 110, 115 (1995). Courts are required to take judicial notice of municipal and county ordinances. 735 ILCS 5/8-1001 (West 2020). Arguably, then, since Couture really was challenging the legal sufficiency of the complaint by reference to an ordinance of which the court had to take judicial notice, his motion for dismissal should have been pursuant to section 2-615 instead of section 2-619(a)(9).

¶ 39 We need not, and perhaps should not, definitively resolve this procedural question. In any event, "[o]n an appeal, it is not proper to raise the denial of a section 2-619 motion to dismiss, as the result of the denial merged with the final judgment from which the appeal was taken." *In re Marriage of Sorokin*, 2017 IL App (2d) 160885, ¶ 22; see also *Ovnik v. Podolskey*, 2017 IL App (1st) 162987, ¶ 20. In the bench trial, the circuit court found Couture to be guilty only of violating the Peoria City Code, not of violating the Peoria County Code. (Couture points out in his brief that "the County abandoned the County-Code-based counts at trial.") Thus, the judgment effectively found in Couture's favor on the county code citations that, in his motion for dismissal, he insisted were inapplicable to him. Having merged with the final judgment, the denial of the section 2-619 motion is moot and unreviewable. See *Sorokin*, 2017 IL App (2d) 160885, ¶ 22; *Ovnik*, 2017 IL App (1st) 162987, ¶ 20; *People ex rel. Johnson v. Doglio*, 43 Ill. App. 3d 420, 421 (1976) (holding that "questions *** which have become moot or academic are not a proper subject of review").

¶ 40 B. Allowing Amendments to the Complaint

¶ 41 On December 17, 2020, the circuit court held a hearing on Couture's motion for dismissal pursuant to section 2-619(a)(9) (735 ILCS 5/2-619(a)(9) (West 2020)). At the hearing, the court denied the motion for dismissal and allowed the assistant state's attorney to amend the complaint by interlineation so as to (1) change the alleged date of the offense from May 7, 2020, to May 6, 2020; (2) add the City of Peoria to the caption as a plaintiff; and (3) add citations to the Peoria City Code, specifically, section 4-22(a)(1), (2), and (6) (Peoria City Code § 4-22(a)(1), (2), (6) (amended Jan. 28, 2020)). On appeal, Couture contends that the court abused its discretion by allowing those amendments to the complaint. See *Village of Wadsworth v. Kerton*, 311 Ill. App. 3d 829, 842 (2000) (holding that "[w]hether to allow an amendment of a complaint is a matter

within the sound discretion of the trial court" and that, "absent an abuse of that discretion, the court's determination will not be overturned on review").

¶ 42          Quoting from *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 505 (1992), Couture argues that we should consider four factors when deciding whether the circuit court abused its discretion by allowing the amendments: "(1) whether the proposed amendment would cure the defects in the original pleading; (2) whether the amendment would prejudice or surprise other parties; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading can be identified." In *E&E Hauling*, however, the supreme court reviewed the *denial* of permission to file a second amended complaint, whereas Couture challenges the *granting* of permission to amend a complaint. See *id.* Likewise, in the case from which *E&E Hauling* obtained the four factors, *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263 (1992), the supreme court reviewed the *denial* of permission to amend a complaint (*id.* at 265-66).

¶ 43          We point out this distinction between those cases and this one because the first factor seems more relevant to reviewing the denial of a motion to amend a pleading than to reviewing the granting of such a motion. If, despite the granting of the motion, the pleading remained defective, the nonmovant's discontent surely would be with persisting in litigation on a legally insufficient pleading, not so much with the ineffectual motion to repair the pleading. In any event, the amendments cured defects in the ordinance-violation complaint, substituting an applicable body of law for an inapplicable body of law. Therefore, assuming its relevance to the *allowance* of amendments, the first factor weighed in favor of allowing the amendments.

¶ 44          The remaining three factors are more obviously relevant to this case. They consider whether, by the proposed amendment, the movant unfairly surprised the opposing party, leaving

the opposing party insufficient preparation time to rebut the new matter raised in the amendment. "Prejudice may be shown where delay before seeking an amendment leaves a party unprepared to respond to a new theory at trial." (Internal quotation marks omitted.) *Hartzog v. Martinez*, 372 Ill. App. 3d 515, 525 (2007). The movant's procrastination should not become the opposing party's emergency. But there was little procrastination in this case. The trial was two months away when the circuit court allowed the assistant state's attorney to amend the ordinance-violation complaint. Couture did not have to frantically scramble for evidence to meet a last-minute amendment. See *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 469 (1992) (holding that, even though the plaintiff "had other opportunities *** to amend the pleadings," the circuit court did not abuse its discretion in permitting amendment, because the opponent "was not prejudiced"); *Taylor v. City of Beardstown*, 142 Ill. App. 3d 584, 591 (1986) (holding that "a trial court should not deny leave to amend solely on the basis of a delay in filing, unless accompanied by a showing of prejudice to the opposing party which goes beyond mere inconvenience").

¶ 45        Couture disagrees that "prejudice," properly understood, is confined to whether he was ambushed on the eve of trial. He complains that he was prejudiced in another sense: the city code was, to him, a more threatening regime than the county code. Under the county code, he was not forbidden to have a nuisance animal in the city, whereas under the city code—citations of which were added to the complaint by amendment—he was forbidden to have a nuisance animal in the city.

¶ 46        Couture's understanding of "prejudice" cannot be right. By his logic, a legally insufficient complaint could never be amended to make it legally sufficient, because a legally sufficient complaint would subject the defendant to the threat of an onerous remedy to which the defendant would not have been subjected under the unamended, legally insufficient complaint. In

Illinois, however, the policy is to "remove barriers which prevent the resolution of a case on its merits." *Scala/O'Brien Porsche Audi, Inc. v. Volkswagen of America, Inc.*, 87 Ill. App. 3d 757, 762 (1980). To that end, permission to amend pleadings should be freely and liberally given "so that cases are decided on their merits" instead of "on procedural technicalities." *Droen v. Wechsler*, 271 Ill. App. 3d 332, 336 (1995). Allowing the correction of pleading defects in the complaint might be "bad" for the defendant in that a previously unstated cause of action is now stated against the defendant. Unless there is a time crunch, however, that cannot reasonably be alleviated by a continuance, this is not the kind of "prejudice" that the cases have in mind. But *of course* defendants are prejudiced when they are *sued*. "Prejudice" to the defendant has to mean more than being sued by the plaintiff on a legally cognizable theory.

¶ 47          In sum, then, we conclude that the four factors cited by Couture militated in favor of allowing the amendments to the ordinance-violation complaint. We are unable to say that the court abused its discretion by allowing the amendments, which enabled the complaint to state a cause of action under the Peoria City Code. See Ill. S. Ct. R. 572(e) (eff. Dec. 7, 2011) (providing that "[t]he charging document may be amended at any time, before or after judgment, to conform the pleadings to the proofs on just and reasonable terms"); see also 735 ILCS 5/2-404 (West 2020) (providing that "[a]ll persons may join in one action as plaintiffs, in whom any right to relief in respect of or arising out of the same transaction or series of transactions is alleged to exist, whether jointly, severally or in the alternative, whenever if those persons had brought separate actions any common question of law or fact would arise"). If, because of the amendments, a cause of action was stated, the court would have abused its discretion by denying permission to amend the complaint. See *Romito v. City of Chicago*, 2019 IL App (1st) 181152, ¶ 28.

¶ 48 But a judge, Couture argues, should not give a party tips on how to state a cause of action. "A trial judge may not be an advocate for a party *** but must take the case as the parties have presented it." *In re Marriage of Drewitch*, 263 Ill. App. 3d 1088, 1093 (1994). Couture accuses Judge Lyons of giving the assistant state's attorney legal advice on how the complaint ought to be amended.

¶ 49 We express no opinion, one way or the other, whether Judge Lyons crossed the line into advocacy. If the line was crossed, the remedy would not have been to prohibit the assistant state's attorney from following Judge Lyons's advice. The remedy, instead, would have been the disqualification of Judge Lyons (see *Cammarata v. Jones*, 763 So. 2d 552, 553 (Fla. Dist. Ct. App. 2000) (*per curiam*))—which Couture did not seek. There was a prescribed procedure for obtaining the substitution of a judge for cause. See 735 ILCS 5/2-1001(a)(3) (West 2020); see also Ill. S. Ct. R. 571 (eff. Dec. 7, 2011) (providing that, "[e]xcept as specifically stated herein or in existing statutes, the Code of Civil Procedure shall apply in all ordinance prosecutions to which these rules apply"). Couture never availed himself of that procedure. He never moved for the substitution of Judge Lyons for cause. The issue of judicial bias, therefore, is forfeited. See *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996) (remarking that "[i]t is well settled that issues not raised in the trial court are deemed waived," that is, forfeited, and may not be raised for the first time on appeal).

¶ 50                    C. The Request for Sanctions Under Rule 137

¶ 51 Couture represents to us that "Judge Lyons never ruled on Couture's request for Rule 137 sanctions to be imposed against the County." Consequently, Couture requests us to rule on the motion by granting it. See *Krautsack v. Anderson*, 223 Ill. 2d 541, 562 (2006).

¶ 52 It is worth noting that, under Illinois Supreme Court Rule 303(a)(1) (eff. July 1, 2017), "[a] judgment or order is not final and appealable while a Rule 137 claim remains pending unless the court enters a finding pursuant to Rule 304(a) [(Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016))]." If, as Couture represents to us, his Rule 137 motion is still pending, we lack jurisdiction, considering that the circuit court never made a Rule 304(a) finding. See *id.*; Ill. S. Ct. R. 579(d) (eff. Dec. 7, 2011) (providing that "[e]ither party shall have the right to appeal any final judgment entered in an ordinance violation case pursuant to Rule 303, 'Appeals from Final Judgments of the Circuit Court in Civil Cases' ").

¶ 53 It appears, though, that the circuit court denied Couture's motion for sanctions. The order of December 17, 2020, reads, "[I]t is hereby ORDERED: the Defendant's Motion to Dismiss with Prejudice and for Rule 137 Sanctions is denied *in its entirety* ***." (Emphasis added.) As a matter of English, that meant that every part of Couture's motion was denied, including the part where he requested sanctions under Rule 137. Because the circuit court ruled on the Rule 137 motion, there is no occasion for us to do so.

¶ 54 D. Violations of the Peoria City Code

¶ 55 1. *Section 4-22(a)(6)*

¶ 56 Because the circuit court fined Couture for violating section 4-22(a)(6) of the Peoria City Code, we will begin with that section. It provided as follows:

> "(a) No person shall own, possess, or harbor a nuisance animal within the city. An animal, other than a dog trained for law enforcement in the performance of its duty, shall be considered a nuisance if such animal:

> * * *

(6) Chases, molests, attacks, bites or interferes with other animals while off the premises of the owner." Peoria City Code § 4-22(a)(6) (amended Jan. 28, 2020).

¶ 57 Couture challenges the circuit court's finding that he violated section 4-22(a)(6). His challenge focuses on the phrase "while off the premises of the owner." *Id.* It is undisputed that on May 6, 2020, Couture's dog bit Salmon's dog in the eighth-floor elevator lobby of a condominium building at 401 Southwest Water Street in Peoria. It also is undisputed that Couture owned a condominium unit in that building and that, additionally, he owned an undivided percentage of the eighth-floor elevator lobby. Was the elevator lobby, then, his "premises"? Or were his "premises" only his condominium unit? Couture's dog was a "nuisance animal" within the meaning of section 4-22(a)(6) only if his dog bit Salmon's dog "while *off* the premises of the owner." (Emphasis added.) *Id.*

¶ 58 We are asked to apply section 4-22(a)(6) to a set of undisputed facts, namely that Couture's dog bit Salmon's dog in the eighth-floor elevator lobby, of which Couture owned an undivided percentage. When we determine the legal effect of undisputed facts, our standard of review is *de novo*. *Thomas v. Diener*, 351 Ill. App. 3d 645, 652 (2004). Likewise, we interpret ordinances *de novo*. *Daley v. American Drug Stores, Inc.*, 294 Ill. App. 3d 1024, 1026 (1998).

¶ 59 In the quoted phrase from the ordinance ("while off the premises of the owner"), the only term that the Peoria City Code defines is "owner":

> "*Owner* means any person 17 years of age or older; or parent or guardian of any person under the age of 17 years; or parent or guardian of an incapacitated person having a right of property in an animal; or who acts as custodian, cares for, keeps, feeds or knowingly permits an animal to remain on or about any premises

occupied by such person; or a person who registers an inoculation certificate for an animal with the county." (Emphasis in original.) Peoria City Code § 4-1 (amended Oct. 22, 2002).

So, "owner" means the owner of the animal—the animal that did the chasing, molesting, attacking, or biting. It appears to be undisputed that Couture was the "owner" as defined in section 4-1: he owned the dog that bit Salmon's dog.

¶ 60　　　　The remaining words in the phrase "while off the premises of the owner" (*id.* § 4-22(a)(6)) are undefined in the Peoria City Code. Couture quotes from *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 7 (2009): "Municipal ordinances are interpreted using the same general rules of statutory interpretation." He notes that, when a legislative body leaves a term undefined, courts ascribe to that term its common meaning, which can be found in a dictionary. *Id.* at 8.

¶ 61　　　　The word "of" in the phrase "while off the premises *of* the owner" (emphasis added) (Peoria City Code § 4-22(a)(6) (amended Jan. 28, 2020)) is "a function word to indicate belonging or a possessive relationship" (Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/of (last visited Jan. 10, 2022) [https://perma.cc/9E3E-Q5UP]). Thus, if in Peoria a dog bites another dog, the biting dog is a "nuisance animal" within the meaning of section 4-22(a)(6) only if the bite was inflicted off the "premises" belonging to or possessed by the biting dog's owner. "[P]remises" are "a building and the area of land that it is on." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/premises (last visited Jan. 10, 2022) [https://perma.cc/QGE7-6WEG]. Or, as another dictionary puts it, "premises" are "the land and buildings owned by someone, especially by a company or organization." Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/premises (last visited Jan. 10, 2022) [https://perma.cc/A9QE-CADD]. The eighth-floor elevator lobby was a common

element in which Couture, as a condominium unit owner, had an undivided percentage of ownership. See 765 ILCS 605/6 (West 2020) (providing that "[e]ach unit owner shall be entitled to the percentage of ownership in the common elements appertaining to such unit as computed and set forth in the declaration"). Therefore, the elevator lobby was Couture's "premises" in the sense that the elevator lobby belonged to him—just as the elevator lobby was the "premises" of other condominium unit owners who had percentage ownership of it. (It is well known that premises can have multiple owners.) As a matter of law, then, it was unproven that Couture's dog bit Salmon's dog "while *off* the premises of" Couture. (Emphasis added.) See Peoria City Code § 4-22(a)(6) (amended Jan. 28, 2020). Because that element was unproven, we reverse the finding of guilt on section 4-22(a)(6).

¶ 62                                          2. *Section 4-22(a)(1)*

¶ 63        The circuit court also found that Couture had violated section 4-22(a)(1) (*id.* § 4-22(a)(1)). That section provided as follows:

> "(a) No person shall own, possess, or harbor a nuisance animal within the city. An animal, other than a dog trained for law enforcement in the performance of its duty, shall be considered a nuisance if such animal:
>
> (1) Damages real or personal property other than the owner's." *Id.*

¶ 64        The city code defines "personal property" as "includ[ing] every species of property, except real property, as defined by this section." (Emphasis omitted.) Peoria City Code § 1-2 (adopted 1957). "Real property" in turn "includes lands, tenements[,] and hereditaments and shall embrace all chattels real." *Id.* Although a dog could pass by inheritance, the word "hereditaments" means only real property (or else all personal property, being inheritable, would also be "real property"; the two categories of property would collapse into one another). See Black's Law

Dictionary (11th ed. 2019) (defining "hereditament" as "1. Any property that can be inherited; anything that passes by intestacy. 2. Real property; land"). Because Salmon's dog was not "real property" as defined by the city code, it was, by default, "personal property." See also 3B C.J.S. *Animals* § 5 (2021) (noting that "[d]ogs are considered to be personal property"). Couture had no ownership interest in Salmon's dog. Therefore, it seems simple and straightforward that, by killing Salmon's dog, Couture's dog damaged personal property belonging to someone other than Couture. See Peoria City Code § 4-22(a)(1) (amended Jan. 28, 2020).

¶ 65 In Couture's view, though, the analysis is not so simple. To him, "[i]t is clear from the context of section 4-22(a)(1) that 'personal property' was not intended to include animals, domestic or otherwise." He maintains that section 4-22(a)(1) and section 4-22(a)(6) are *in pari materia* (a Latin phrase meaning "in the same matter") and that they must be interpreted in conjunction with one another. He reasons along these lines:

> "Under subsection (6), an animal can be declared a nuisance for certain conduct toward another animal, but only if that conduct took place off the premises of the offending animal's owner. [Citation.] It follows, then, that the City Council did not intend to hold owners responsible if the offending conduct took place *on* their premises." (Emphasis in original.)

To honor that intent, Couture concludes, we must interpret "personal property," in section 4-22(a)(1), as meaning personal property *except* animals.

¶ 66 Construing "personal property" as including animals "would *** have absurd and unjust consequences," Couture continues. He invites us to consider a hypothetical in which *A*'s dog is in *A*'s yard and *B*'s dog, passing by on the street, breaks free of its leash and runs toward *A* and his dog. Frightened for itself and for its owner, *A*'s dog bites *B*'s dog, injuring it. Because the

- 23 -

bite was inflicted on *A*'s premises, *A* would not have violated section 4-22(a)(6). But if "personal property" in section 4-22(a)(1) included animals, *A* would have violated section 4-22(a)(1) and would have to either get rid of his dog or move out of Peoria. Such an absurd, inconsistent result would be avoided, Couture observes, if "personal property in section 4-22(a)(1) were interpreted as excluding animals." He quotes from *Palm v. Holocker*, 2018 IL 123152, ¶ 21: "We have an obligation to construe statutes in a manner that will avoid absurd, unreasonable, or unjust results that the legislature could not have intended."

¶ 67    By urging us, in the name of avoiding "absurdity," to read an exception into the clear language of section 4-22(a)(1), Couture could open himself up to the criticism that his textualism is opportunistic. After all, when it comes to section 4-22(a)(6), he exhorts us to stick faithfully to the text, without reading into "premises" an exception for cotenancies or easements. (He informs us that he both owns a percentage of the eighth-floor elevator lobby and has an ingress/egress easement over it.) For purposes of section 4-22(a)(6), he maintains that, "[w]here an enactment is clear and unambiguous, [courts] are not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations[,] or conditions that the legislature [(or, in this case, the city council)] did not express." *DeSmet v. County of Rock Island*, 219 Ill. 2d 497, 510 (2006). When it comes to section 4-22(a)(1), though, he wants us to read "personal property" as "personal property except for animals," and he insists that this exception is necessary to avoid absurdity and injustice. He argues that the term "personal property" really does not embrace, as section 1-2 puts it, "*every* species of property[ ] except real property" and that to suppose the city council meant literally what it said in that definitional language would be untenable. (Emphasis added.) Peoria City Code § 1-2 (adopted 1957).

¶ 68    This kind of argument calls to mind a warning by the supreme court:

" '[T]o maintain the separation of the legislative and judicial branches and avoid compromising our fidelity to the text, we should be extremely reluctant to second-guess the clear language of legislation ***. [Citation.] Whenever a court disregards the clear language of legislation in the name of "avoiding absurdity," it runs the risk of implementing its own notions of optimal public policy and effectively becoming a legislature. Interpreting legislation to mean something other than what it clearly says is a measure of last resort, to avoid "great injustice" or an outcome that could be characterized, without exaggeration, as an absurdity and an utter frustration of the apparent purpose of the legislation. [Citation.]' " *Illinois State Treasurer v. Illinois Workers' Compensation Comm'n*, 2015 IL 117418, ¶ 39 (quoting *Dusthimer v. Board of Trustees of the University of Illinois*, 368 Ill. App. 3d 159, 168-69 (2006)).

¶ 69 The apparent purpose of section 4-22(a)(1) is to exclude animals from the city that cause annoyance and distress to others by damaging their property. Because people grow attached to their dogs, these items of personal property tend to be especially cherished. Commonly, dogs are treated more as members of the family than as mere chattels. The killing of a beloved dog can cause considerably more anguish than other kinds of property damage. Therefore, interpreting "personal property" in accordance with its plain meaning, as including dogs, would not be an *utter* frustration of the apparent purpose behind section 4-22(a)(1), namely, saving Peoria residents from the trauma and expense of animal-inflicted property damage. See *id.*

¶ 70 Only the utter-frustration standard can override clear statutory language (or clear language in an ordinance). *In pari materia* will not do it. As a matter of fact, the *in pari materia* canon of construction that Couture invokes is an "extrinsic aid for construction of an *ambiguous*

statute." (Emphasis added.) *Golden v. Puccinelli*, 2016 IL App (1st) 150921, ¶ 16. "It is fundamental that before the rule of *in pari materia* is applied, the statute to be construed must be found to be ambiguous." *People v. 1946 Buick, VIN 34423520*, 127 Ill. 2d 374, 377 (1989). A statutory provision is ambiguous if it is "capable of being understood in two or more different senses by reasonably well-informed people." *Wal-Mart Stores, Inc. v. Industrial Comm'n*, 324 Ill. App. 3d 961, 967 (2001). Section 1-2 (Peoria City Code § 1-2 (adopted 1957)) defines "personal property" in plain, simple language that is not susceptible to different interpretations. Because the statutory language is unambiguous, there is no occasion for applying the doctrine of *in pari materia*. See *1946 Buick*, 127 Ill. 2d at 377; *Wal-Mart*, 324 Ill. App. 3d at 967.

¶ 71        Just because it is possible to imagine circumstances in which a clearly worded ordinance would work an injustice, that is no justification for rewriting the ordinance in the guise of interpretation. To be sure, we can see the unfairness of penalizing a dog's owner if, for instance, the dog were bitten and bit back. Applied to those circumstances, section 4-22(a)(1) could indeed be regarded as less than " 'optimal public policy.' " *Illinois State Treasurer*, 2015 IL 117418, ¶ 39. But just because section 4-22(a)(1) would be unfair in some circumstances, that is no excuse for second-guessing its plain language, especially if circumstances could be posited in which the ordinance might make more sense. After all, dogs sometimes escape—they sometimes slip the leash or dig under the fence—and out of playfulness, curiosity, or sociability, they approach dogs on other properties. The city council could have decided that, if the landowner's dog chased such a trespassing dog off the premises by, say, nipping at it without causing any real injury, no action would be warranted. But if the landowner's dog ruthlessly killed the wandering poodle that ventured onto the front lawn, maybe action would be warranted. Maybe such a dog would be too violent and too much of a risk to have within city limits. The city council chose to draw the line at

property damage. The line was drawn with a broad brush. Just because the line is, perhaps, imperfect and could be drawn with greater refinement, we will not "interpret" the ordinance as meaning something other than what it plainly says. See *id.*

¶ 72        It seems to us there is no getting around it: by killing Salmon's dog, Couture's dog "[d]amage[d] *** personal property" within the plain meaning of section 4-22(a)(1) (Peoria City Code § 4-22(a)(1) (amended Jan. 28, 2020)). Therefore, we affirm the finding of guilt on that section.

¶ 73                              3. *Section 4-22(a)(2)*

¶ 74        The circuit court also found that Couture had violated section 4-22(a)(2) of the Peoria City Code, which provided as follows:

> "(a) No person shall own, possess, or harbor a nuisance animal within the city. An animal, other than a dog trained for law enforcement in the performance of its duty, shall be considered a nuisance if such animal:
>
> ***
>
> (2) Causes unsanitary, dangerous or unreasonably offensive conditions."
>
> *Id.* § 4-22(a)(2).

¶ 75        The circuit court found that the bloodstain on the carpet of the elevator lobby was an unreasonably offensive condition. The question for us is whether that finding is against the manifest weight of the evidence. See *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 51 (2009). A finding is against the manifest weight of the evidence only if it is apparent, from the evidence in the record, that the trier of fact should have reached the opposite finding or only if the finding "appear[s] to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). We are unable to say that it was unreasonable,

arbitrary, or not based on the evidence to characterize the bloodstain on the carpet as an unreasonably offensive condition, especially considering that (1) the bloodstain came back after the carpet was scrubbed and dried and (2) an inference could be drawn that the section of carpet consequently had to be replaced.

¶ 76　　　　Couture complains that the supposed replacement of the section of carpet rested on hearsay, specifically, Salmon's testimony that Rose, the building manager, told him she would have the section of carpet replaced. In the trial transcript, however, we do not see any hearsay objection to that portion of Salmon's testimony. "It is well established that when hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect." *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 508 (1985).

¶ 77　　　　In sum, under our deferential standard of review (see *Gambino*, 398 Ill. App. 3d at 51), we see no reason to gainsay the circuit court's finding that Couture additionally violated section 4-22(a)(2) (Peoria City Code § 4-22(a)(2) (amended Jan. 28, 2020)). Therefore, we affirm the finding of guilt on that section as well.

¶ 78　　　　　　　　　　E. Canine Propensity Evidence

¶ 79　　　　On February 18, 2021, Couture e-mailed to the assistant state's attorney a witness list. According to the witness list, (1) Sacco would "testify regarding her evaluation of Mr. Couture's dog," (2) Monroe and Velde would "testify regarding the disposition and behavior of Mr. Salmon's dogs and Mr. Couture's dog," and (3) Howard would "testify to the disposition and behavior of Mr. Couture's dog."

¶ 80　　　　In response to the e-mail, the assistant state's attorney filed a motion *in limine* to exclude canine propensity evidence from the trial. The motion argued, "The propensity of either

dog is not relevant to determine whether Mr. Couture's dog was a nuisance at the relevant time, and propensity is not outlined as [a] yardstick for any of the subsections."

¶ 81    On February 19, 2021, after hearing arguments, the circuit court granted the motion *in limine*, agreeing that dog propensity was irrelevant. The court explained, "[W]ith regard to testimony that *** attaches to propensity, or what you're calling 'dog character,' I do not find any support that allows for that when the citation or the ordinance applied against the defendant is the one used."

¶ 82    On appeal, Couture challenges that ruling. He contends that canine propensity evidence would have been relevant to his claim that the cited provisions of the Peoria City Code, as applied to him, violated substantive due process. He explains that he "was planning to use propensity evidence to show that Salmon lied about the circumstances surrounding the incident and that the application of section 4-22(a) to Couture was absurd under the true circumstances."

¶ 83    Salmon testified that his dogs were on leashes and that he was holding the leashes when Couture's dog bit and killed one of his dogs. Couture, on the other hand, testified that he was holding his dog on a leash when Salmon's dog, dragging its leash, began barking and approached Couture and his dog, whereupon Couture's dog bit and killed Salmon's dog (although Couture did not see his dog inflict the bite).

¶ 84    Couture seems to be suggesting that if, in killing Salmon's dog, Couture's dog acted out of necessity to defend itself or Couture, then section 4-22(a), as applied to Couture, would be absurd—or, to use the language of case law, "the ordinance, as applied to him, [would be] palpably arbitrary, capricious, and unreasonable and [would] bear[ ] no rational relationship to the health and safety of the community." *City of Des Plaines v. Gacs*, 65 Ill. App. 3d 44, 48 (1978). In an as-applied challenge, "a plaintiff protests against how an enactment was applied in the particular

context in which the plaintiff acted or proposed to act." *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008). Let us assume, for the sake of argument, that a dog's merely approaching another dog while barking can be reasonably characterized as an attack necessitating a lethal response. Even so, it is unclear how canine propensity evidence would have tended to prove that Salmon was lying and that Couture was telling the truth. Either Salmon had hold of the leash, or he did not. Salmon never claimed that his dog lacked a propensity to bark. Nor did he claim that, unrestrained, his dog would have lacked a propensity to approach other dogs.

¶ 85        Part of the problem here might be that we do not know what Couture's witnesses would have said. We do not know because Couture made no offer of proof.

¶ 86        When the circuit court grants a motion *in limine*, the ruling is considered to be interlocutory and is open to reconsideration in the course of the trial. *Cundiff v. Patel*, 2012 IL App (4th) 120031, ¶ 20. The court reserves the right to change its mind as the trial unfolds and as the context becomes clearer for the evidence in question. Therefore, on pain of forfeiting appellate review of the granting of a motion *in limine*, the proponent of the evidence must follow up by making an offer of proof in the trial itself. *Id.* Case law requires an offer of proof for two reasons: (1) the opposing counsel cannot make an informed objection, and the court cannot make an informed ruling, unless they have a clear idea what the proffered evidence is, and (2) the reviewing court needs a clear description of the proffered evidence to decide whether the circuit court's ruling in the trial was a prejudicial abuse of discretion. See *id.*

¶ 87        To serve those dual purposes, the offer of proof has to be more than a vague gesture at some subject matter. It has to be more than the statement of a topic. *Cundiff* explains how an offer of proof is made:

"A formal offer of proof is made whereby counsel offers the proposed evidence or testimony by placing a witness on the stand, outside the jury's presence, and asking him questions to elicit with particularity what the witness would testify to if permitted to do so. [Citation.] Counsel can make an adequate offer of proof if he informs the trial court, with particularity, of the substance of the witness'[s] anticipated answer." (Internal quotation marks omitted.) *Id.*

From the e-mail that Couture's attorney sent to the assistant state's attorney on February 18, 2021, we know the topic of Sacco's expected testimony: "her evaluation of Mr. Couture's dog." But we do not know what Sacco would have said about Couture's dog. Likewise, we know the topics of Monroe's and Velde's expected testimony: "the disposition and behavior of Mr. Salmon's dogs and Mr. Couture's dog." But we do not know what Monroe and Velde would have said about the dispositions and behaviors of those dogs. We know the topic of Howard's expected testimony, too: "the disposition and behavior of Mr. Couture's dog." But we do not know what Howard would have said about the disposition and behavior of Couture's dog. In other words, we do not know, with particularity, the substance of the witnesses' answers. See *id.*

¶ 88         Even so, Couture cites *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 495 (2002), and *Reuter v. Korb*, 248 Ill. App. 3d 142, 154 (1993), for the proposition that "an offer of proof is not required where it is apparent that the trial court clearly understood the nature and character of the evidence sought to be introduced" (*Dillon*, 199 Ill. 2d at 495). In *Dillon*, however, the defendants put Dr. John Raaf on the stand, and after "the equivalent of approximately 20 record pages of testimony," it was obvious that Dr. Raaf was about to offer cumulative testimony that Dr. Stephen Sener had met the medical standard of care. *Id.* at 494. Likewise, in *Reuter*, it was obvious what the accident reconstruction expert Roland Ruhl would have said on the stand. When granting

the defendant's motion *in limine* to bar Ruhl from testifying, the circuit court had before it a transcript of Ruhl's deposition testimony. *Reuter*, 248 Ill. App. 3d at 157. "Consequently, the court was well apprised regarding what the evidence would be if Ruhl were allowed to testify." *Id.*

¶ 89 By contrast, the circuit court in this case was not well apprised what Sacco, Monroe, Velde, and Howard would have said about Couture's dog and Salmon's dogs. Nor are we well apprised. We decline to speculate. Therefore, we conclude that Couture has forfeited the issue of whether the circuit court erred by granting the motion *in limine*. See *Koehler v. Packer Group, Inc.*, 2016 IL App (1st) 142767, ¶ 108; *In re Estate of Nicholls*, 2011 IL App (4th) 100871, ¶ 36.

¶ 90                            III. CONCLUSION

¶ 91 For the foregoing reasons, we reverse the finding that Couture violated section 4-22(a)(6) of the city code (Peoria City Code § 4-22(a)(6) (amended Jan. 28, 2020)). But we otherwise affirm the circuit court's judgment, including the findings on the remaining two provisions of the city code (*id.* § 4-22(a)(2), (6)) as well as the fine and the court costs.

¶ 92 Affirmed in part and reversed in part.

**No. 3-21-0091**

| | |
|---|---|
| **Cite as:** | *County of Peoria v. Couture*, 2022 IL App (3d) 210091 |
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 20-OV-428; the Hon. Kevin W. Lyons, Judge, presiding. |
| **Attorneys for Appellant:** | Joseph E. Couture, of Peoria, appellant *pro se*. |
| **Attorneys for Appellee:** | Jodi Hoos, State's Attorney, of Peoria (Dana Hughes, Assistant State's Attorney, of counsel), for appellees. |