2024 IL App (2d) 230260
No. 2-23-0260
Opinion filed September 9, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-139 |
| AMALIO GUTIERREZ, | ) ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE MULLEN delivered the judgment of the court, with opinion.
Justices Schostok and Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Amalio Gutierrez, was charged with four counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2018)). Counts I through III alleged that defendant "fondled the vagina of [F.B.] for the purpose of the sexual arousal of *** defendant." Count IV alleged that defendant "fondled the breast of [F.B.] for the purpose of the sexual arousal of *** defendant." At defendant's jury trial, F.B. testified in detail about how defendant touched her vagina one night in the summer of 2018. Specifically, she stated that he touched her vagina, left the room, returned, and then "did it once more." Defendant testified that, during that same summer, F.B. "threatened" him when her cell phone was taken away because she misbehaved. Defense counsel then asked, "What do you mean she threatened you?" The State objected on hearsay grounds; defense counsel

argued that the question was asked to establish F.B.'s state of mind or motive, not the truth of the threat, and the trial court sustained the objection. Defense counsel made no offer of proof concerning defendant's answer to the question. The jury found defendant guilty of counts II, III, and IV (the trial court had granted a directed verdict for defendant on count I). Defendant filed a posttrial motion, arguing that, among other things, the trial court erred in sustaining the objection to defense counsel's question about the substance of F.B.'s threat. Defendant also asserted that, had the objection not been sustained, he would have testified that F.B. told him "he would 'pay for this,' followed by a swear word." The court denied defendant's posttrial motion, and he was sentenced to 30 months of sex offender probation. This timely appeal followed. On appeal, defendant argues that (1) the trial court erred in precluding defendant from testifying about the nature of F.B.'s threat and (2) the State failed to prove beyond a reasonable doubt that he was guilty of both counts II and III, as F.B.'s testimony that "[defendant] did it once more" was insufficient to prove a second act of aggravated criminal sexual abuse. We affirm.

¶ 2                    I. BACKGROUND

¶ 3      At trial, F.B. testified that, in 2018, she lived in a two-story townhome in Elgin with M.V. (her mother), her two siblings, and defendant, who was not her biological father.[1] The living room, dining area, and kitchen were on the townhome's first floor. The living room had two couches set up in an "L." The television was mounted on the wall in front of one of the couches. The couches were surrounded by an exterior sliding glass door, the kitchen, and the dining area. M.V.'s bedroom was on the second floor.

---

[1]Her youngest sibling, three-year-old L.G., was the biological child of M.V. and defendant.

¶ 4    In the summer of 2018, F.B. was 13 years old.[2] She enjoyed using her cell phone to talk to friends and watch movies. When she misbehaved, her cell phone was taken away. Sometime that summer, F.B.'s cell phone was taken away as punishment. One night, she snuck downstairs to the first floor to watch television, paint, or use her brother's iPad. She sat on one of the two couches in the living room. She was alone. Defendant eventually joined her, sitting next to her on the couch. Defendant asked F.B. to teach him how to play a game on the iPad. Defendant also asked her if she wanted a blanket to cover herself because it was cold. F.B. said she did. Defendant retrieved a blanket and covered F.B. and himself with it.

¶ 5    Defendant then put his hands on F.B.'s legs. F.B. "continuously *** tried to *** move them away from [her], and [defendant] continuously put them back on [her]." When asked what part of her leg defendant touched, F.B. testified that he put his hand on her thigh, close to her hip. While he did this, defendant's eyes were closed, but F.B. knew he was not asleep. When F.B. removed defendant's hand from her hip, he placed his hand between her legs, on her vagina. Defendant then rubbed F.B.'s vagina with his hand.

¶ 6    F.B. got up from the couch and went into the kitchen. When she returned to the living room, she sat next to defendant on the couch. The State asked F.B., "And what happened after you sat back down on the couch?" She replied, "Um, he did it once more, and when I removed his hand that time, he put his hand over the blanket and then he, um, he squeezed one of my breasts ***."

¶ 7    F.B. immediately got up from the couch, throwing defendant's arm and the blanket off her. She then stared at defendant. Defendant kept his eyes closed during the entire incident, feigning sleep, and said nothing. F.B. then went upstairs to M.V.'s bedroom and lay in bed with her. M.V.

---

[2]F.B. was 18 years old when she testified at defendant's trial.

woke up and asked F.B. if everything was okay. F.B. did not tell M.V. what had happened. F.B. testified that, because defendant provided financially for the family and M.V. was not working steadily, she was afraid of what would happen to her family if defendant got in trouble and could no longer support them. F.B. testified that, before the incident, she considered defendant her stepfather, as he had always been kind to her. After the incident, defendant became very distant.

¶ 8 On cross-examination, F.B. stated that she did not remember M.V. coming to the living room twice on the night of the incident. F.B. also testified that, after the incident, she went to Florida with her biological father, her oldest sibling, and her cousin. When she returned, defendant was no longer living in the townhome, and F.B. did not recall defendant ever returning there. F.B. stated that she remembered M.V. and defendant fighting about defendant buying a new truck, but she did not remember whether that argument occurred before or after her trip to Florida. F.B. also did not remember who paid for her cell phone or whether defendant sold her phone after it was taken away from her. F.B. recalled having a couple of broken phones and getting a new phone, but she did not remember what happened to it. F.B. remembered telling an investigator that her cell phone was taken away and that, eventually, a friend gave her a cell phone to use.

¶ 9 M.V., who testified with the help of a Spanish interpreter, agreed that her family relied on defendant financially. In August 2018, F.B. approached her and told her that she wanted to talk. F.B. was nervous and confused and looked like she had something important to say. F.B. gave M.V. a letter from F.B.'s diary.

¶ 10 M.V. testified that defendant's behavior changed during the summer of 2018. Some of his paychecks went missing, and he would wake up in the middle of the night to watch television on the first floor while M.V. was asleep in her bedroom. Concerning the missing paychecks, defendant told M.V. that the company he worked for was bankrupt and he was owed those

paychecks. M.V. stated that she was not upset about the missing paychecks, as she believed defendant was telling the truth. Regarding defendant getting up to watch television, M.V. recalled that defendant did so several times. M.V. remembered one instance when he did so, because F.B. came to M.V.'s bedroom that night. Before F.B. came to her bedroom, M.V. had gone downstairs to check on F.B. and defendant in the living room. Defendant was on the couch and "told [M.V.] that [F.B.] was in the bathroom." M.V. returned to her bedroom and was joined five minutes later by F.B. After that night, according to M.V., defendant was always in a "bad mood."

¶ 11    On cross-examination, M.V. testified that F.B. was unhappy when her cell phone was taken away. M.V. was asked what she told investigator Tim Bosshart from the Child Advocacy Center (CAC) in September 2018. Although she agreed that she might have told Bosshart that she saw F.B. and defendant sitting on separate couches, she also stated that "this occurrence happened several times." She then asserted, "I'll repeat again. This happened several times. So, the night when [F.B.] came upstairs, I remember clearly I went downstairs, I saw [defendant], I asked him about [F.B.], and he told me [he would] be upstairs pretty soon." M.V. later was asked on cross-examination whether "[she] told *** Bosshart the particular night that [F.B.] came to [her] room [that she] remember[ed] that [she] went downstairs twice seeing them sitting on different couches." M.V. replied, "Yes. [Defendant] was directly in front of the TV and [F.B.] was to the left." M.V. also clarified that she did not do anything the night F.B. came to her bedroom, because "[she] didn't think that anything happened. [She] couldn't imagine that something could have happened." M.V. stated that she was not angry with defendant when he bought a new truck and she did not believe that defendant was spending money on other women.

¶ 12    On redirect examination, M.V. stated that she was responsible for punishing F.B. and, when F.B. misbehaved, she was the one who took her cell phone away. M.V. also asserted that, although

there were times when she was asleep and did not realize that defendant went downstairs to watch television, she "remember[ed] perfectly three occasions" when he left the bedroom at night and she went downstairs and saw defendant and F.B. On one occasion, "[defendant] was in front of the TV and [F.B.] was to the left." On another occasion, "[F.B.] was in the bathroom. When she was in the bathroom [defendant] told me that she was teaching him how to play a video game ***." On the third occasion, "[defendant] was sitting in front of the TV and [F.B.] was sitting to the right." M.V. was then asked, "So, there was a third occasion where you recall [F.B.] being on the couch with [defendant]?" She replied, "In the living room with him, correct." M.V. asserted that she told Bosshart about all three occasions.

¶ 13    Bosshart testified that, on August 31, 2018, he began investigating whether defendant abused F.B. During that investigation, he interviewed M.V. M.V. told him that, when she went downstairs, F.B. and defendant were on separate couches in the living room. She told them to go to bed, returned to her bedroom, and then went to the living room 30 or 40 minutes later. M.V. told Bosshart that "the two of them were [still] there" when she returned and that she told them again to go to bed.

¶ 14    On cross-examination, Bosshart clarified that M.V. told him that she saw F.B. and defendant sitting on separate couches both times she went downstairs. Bosshart did not recall M.V. telling him she saw F.B. and defendant on the same couch. Also, M.V. never told him that she saw defendant alone on a couch while F.B. was in the bathroom. Although Bosshart indicated that his report on the interview with M.V. was accurate and truthful, he also stated that it was a "summary" of their discussion. (We note that nothing indicated whether Bosshart's interview of M.V. was conducted in Spanish or with the help of a Spanish interpreter.)

¶ 15    The State rested, and defendant moved for a directed verdict. The trial court granted that motion as to count I.

¶ 16    Defendant testified with the help of a Spanish interpreter. At the outset of his testimony, he denied touching F.B.'s vagina or breast under or over her clothes. Defendant stated that he worked construction in the summer of 2018, leaving the home at 4 a.m. and returning at 9 p.m. He lived off and on in the townhome with M.V. and the three children. When the couple argued about defendant's missing paychecks or his alleged infidelity, defendant would leave and live with his parents. At one point, he left the townhome for three weeks. In early September 2018, within one week of his return to the townhome, M.V. confronted him with F.B.'s allegation that he had abused her. Although defendant was offended that F.B. had made such accusations, he told M.V. that they should contact the police and resolve the issue. Defendant left the townhome when M.V. told him about F.B.'s accusations. He spoke to the police on December 5, 2018, cooperating fully with their investigation. Defendant was not arrested at that time.

¶ 17    Defendant testified that M.V. was the one who disciplined F.B., although he would tell M.V. when F.B. misbehaved. M.V. disciplined F.B. by taking away her cell phone or grounding her. Defendant testified that, at some point during the summer of 2018, M.V. took away F.B.'s cell phone because she misbehaved, although he admitted telling the police that he took away the phone. Defendant stated that he had paid for F.B.'s cell phone and sold it after it was taken away. Defendant was then asked, "How did [F.B.] react to that?" Defendant replied, "[F.B.] got angry and she threatened me." The State did not object at this point. Defendant was then asked, "What do you mean she threatened you?" At this point, the State interposed a hearsay objection. The trial court sustained the objection, advising defendant, "Don't answer the question. You cannot testify, you cannot testify as to what was said to you." Defense counsel asserted, "And, Judge, my response

would just be it does not go to the truth of the matter asserted but state of mind and bias and motive." The court again sustained the objection. Defense counsel continued questioning defendant, without making an offer of proof concerning the threat.

¶ 18    On cross-examination, defendant testified that he had a close relationship with F.B. and considered her his stepdaughter. Sometimes, when he got home from work, he would paint with F.B. Although he agreed that he and F.B. watched movies together, he stated that he did not believe that he ever watched a movie alone with F.B. Rather, he watched movies with the entire family. Defendant denied ever sitting next to F.B. on the couch while watching movies. Defendant stated that F.B. showed L.G. how to play a game on the iPad but she never showed defendant. When defendant got home from work at 9 p.m., L.G. would be awake and they would sometimes eat dinner together. L.G. would play after eating and then go to bed after 10 p.m. Defendant claimed that L.G. would be the last one to go to sleep, taking himself to bed when he got tired. On redirect examination, defendant explained that L.G. stayed up so late to spend time with defendant.

¶ 19    Carpentersville police officer Edward Acot confirmed that defendant spoke to him on December 5, 2018.[3] Acot stated that defendant voluntarily came to the police station and was allowed to leave after the interview.

¶ 20    During closing arguments, the State and defendant referenced F.B.'s testimony that defendant touched her vagina, she went to the kitchen, and when she returned, defendant "did it once more." Both parties also addressed whether F.B. lied about defendant touching her and what motive she might have had for doing so. Defendant argued: "I think more importantly is the State's

---

[3]The record does not indicate why defendant was not interviewed by an Elgin police officer.

question of why, why would [F.B.] lie about this, and that gets back to bias, looking at the biases of the witnesses. I think there are, there are several reasonable inferences that you can draw from the evidence about why [F.B.] would say something like this happened." Defendant argued that there were a number of reasons that F.B. would lie about defendant, including because defendant sold her cell phone. "She's angry that [defendant] sold her phone. She's so angry that she verbally threatens him ***."

¶ 21    While the jury deliberated, it submitted eight questions to the trial court. One of those questions was: "[Y]ou mentioned a threat during closing argument. What was the threat?" With the parties' approval, the court advised the jury: "[Y]ou have heard all of the evidence in this case. Your decision must be based on the evidence you have heard." The jury found defendant guilty of counts II, III, and IV.

¶ 22    Defendant filed a posttrial motion, arguing that he should have been allowed to testify about the substance of F.B.'s threat, as the threat went to F.B.'s state of mind or motive. He claimed that, had he been allowed to testify about the threat, he would have stated that "[F.B.] said he would ['] pay for this['] and called him a swear word." The trial court denied the motion, noting that the issue was "argued *** thoroughly at the trial" and that it believed it made the proper ruling.

¶ 23    Defendant was sentenced, and this timely appeal followed.

¶ 24                                II. ANALYSIS

¶ 25    Initially, we address the State's request that we disregard misleading portions of defendant's initial brief. The State notes that, in the fact section of his initial brief, defendant quotes F.B.'s testimony that defendant "did it once more" but omits her additional testimony that she "removed [defendant's] hand that time." According to the State, defendant "then relies on this mischaracterization of the record in the argument section of his brief, insisting [F.B.'s] testimony

was too vague to indicate hand-to-sex-organ contact." Defense counsel does not deny that she "truncated a phase from F.B.'s testimony," but she affirms that her factual presentation was fair and complete on the whole. We have reviewed the record ourselves and provided a fair presentation of the facts. In that light, we will not strike any part of defendant's brief, as the deficiencies the State identifies do not hinder our review. See *People v. Zarbock*, 2022 IL App (2d) 210238, ¶ 30. However, we remind defense counsel of our supreme court's briefing requirements. See Ill. S. Ct. R. 341 (eff. Oct. 1, 2020).

¶ 26    On the merits, defendant raises two issues on appeal: whether (1) the trial court erred in sustaining the State's hearsay objection to testimony about the substance of F.B.'s threat and (2) the State failed to prove defendant guilty beyond a reasonable doubt of both counts II and III, as her testimony that "[defendant] did it once more" was insufficient. We address each issue in turn.

¶ 27                              A. Hearsay Objection

¶ 28    Initially, we must address the procedural effect of defendant's failure to make an offer of proof when the trial court barred him from testifying about the content of F.B.'s threat. We hold that Illinois Rule of Evidence 103 (eff. Oct. 15, 2015) required defendant to make a contemporaneous offer of proof to preserve his claim of error. Therefore, by failing to make that contemporaneous offer of proof, defendant has forfeited any challenge to the trial court's ruling. Moreover, defendant fails to argue that we should address his forfeited claim under the plain error rule.

¶ 29    In examining Rule 103, which we interpret in the same way as statutes, we are guided by the well-settled rules of statutory construction. See *People v. Degrave*, 2023 IL App (1st) 192479, ¶ 67. "Our primary objective when construing a [rule] is to ascertain the intent of the [drafters] and

give effect to that intent." *People v. Ramirez*, 2023 IL 128123, ¶ 13. "The best evidence of [the drafters'] intent is the [rule's] language itself, which must be given its plain and ordinary meaning." *Id.* "[Rules] must be read as a whole, and all relevant parts should be considered." *Id.* "A reviewing court may also discern [the drafters'] intent by considering the purpose of the [rule], the problems to be remedied, and the consequences of interpretating the [rule] one way or another." *People v. Palmer*, 2021 IL 125621, ¶ 53. We "may not depart from the language of the [rule] by interjecting exceptions, limitations, or conditions tending to contravene the purpose of the [rule]." *Ramirez*, 2023 IL 128123, ¶ 13. We review *de novo* the construction of a rule. *Id.*

¶ 30     The Illinois Rules of Evidence were adopted in 2010. Ill. S. Ct., M.R. 24138 (eff. Jan. 1, 2011). Insofar as the rules relate to objections to evidence and the preservation of the record on appeal, the rules incorporated the current law of Illinois. See Ill. Rs. Evid., Committee Commentary (adopted Sept. 27, 2010); Anne M. Therieau, *New Illinois Rules of Evidence*, 24 DCBA Brief 32, 32-33 (Dec. 2011).

¶ 31     Subsection (a)(2) of Rule 103 dictates the steps a party must take during the trial to properly raise a claim of error in the exclusion of evidence. Ill. R. Evid. 103(a)(2) (eff. Oct. 15, 2015). Subsection (a)(2) provides that, when evidence is excluded, an offer of proof must be made unless "the substance of the evidence *** was apparent from the context within which questions were asked." *Id.*

¶ 32     The purpose of an offer of proof is to apprise the trial court, opposing counsel, and courts of review of "what the excluded evidence would have entailed." *People v. Way*, 2017 IL 120023, ¶ 33. "An offer of proof must be 'considerably detailed and specific' [citation], and one that 'merely summarizes the witness' testimony in a conclusory manner is inadequate' [citation]." *Id.* Where an objection is sustained excluding testimony, "an adequate offer of proof is made if

counsel makes known to the trial court, with particularity, the substance of the witness' anticipated answer.*" People v. Andrews*, 146 Ill. 2d 413, 421 (1992) (citing Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 103.7, at 21 (5th ed. 1990)).

¶ 33    Here, defendant did not make an offer of proof during the trial, and the substance of the evidence excluded, *i.e.*, the content of F.B.'s threat, was not apparent from the questions that were asked. In this case, defendant had already testified that F.B. threatened him after his involvement with her discipline. The next question was: "What do you mean she threatened you?" When the State objected, defendant provided no particularity about the substance nor any details or specifics about the anticipated answer, or even a summary of it; he merely offered a theory as to why the testimony he sought to introduce was not hearsay: "Judge, my response would just be it does not go to the truth of the matter asserted but state of mind and bias and motive." But what is required is "reference to what the testimony would actually consist of." See *id.* at 422 (finding statement as to the relevancy of rejected testimony was inadequate to preserve the issue on appeal). Because defendant was required to make an offer of proof, then the next question is whether defendant was required to make that offer contemporaneously—*i.e.*, when the trial court made the challenged ruling—or if defendant preserved the issue by including the offer of proof in his posttrial motion.

¶ 34    Rule 103(b)(1) provides that, "where the court has not made a previous ruling on the record concerning the admission of evidence, *a contemporaneous trial objection or offer of proof* must be made to preserve a claim of error for appeal." (Emphasis added.) Ill. R. Evid. 103(b)(1) (eff. Oct. 15, 2015). To determine whether subsection (b)(1) required defendant to make an offer of proof when the trial court made its ruling, we must ascertain whether the adjective "contemporaneous" modifies both "trial objection" and "offer" in Rule 103(b)(1). If it does, then defendant has forfeited review of the issue he raises, because he made no offer of proof when the

trial court barred him from testifying about the content of F.B.'s threat. See *Andrews*, 146 Ill. 2d at 421 ("The failure to make an adequate offer of proof results in a [forfeiture] of the issue on appeal."). If it does not, then, as defendant argues, the offer of proof he made for the first time in his posttrial motion was sufficient to preserve the issue for review and, thus, his claim is not forfeited. See *id.*; see also Ill. R. Evid. 103(b)(4) (eff. Oct. 15, 2015). Like the construction of a rule, we review *de novo* whether defendant has forfeited the issue he raises. See *People v. Brown*, 2017 IL App (3d) 140514, ¶ 11 ("The issue of whether a defendant forfeited an argument on appeal is a question of law that we review *de novo*.").

¶ 35    In resolving whether "contemporaneous" modifies "offer," we find *Lyons Township ex rel. Kielczynski v. Village of Indian Head Park*, 2017 IL App (1st) 161574, instructive. There, the appellate court construed section 2-106 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/2-106 (West 2014)), which stated: " '[A] local public entity is not liable for an injury caused by an *oral promise or misrepresentation* of its employee, whether or not such promise or misrepresentation is negligent or intentional.' [Citation.]" (Emphasis added.) *Lyons Township*, 2017 IL App (1st) 161574, ¶ 25. Specifically, the court considered whether the term "oral" modified both "promise" and "misrepresentation" in that section. *Id.* Reading the statute as a whole, the court found that it did, stating:

> "Given the commonly understood principles of grammar and usage, we find the legislature intended for the adjective 'oral' to modify both 'promise' and 'misrepresentation.' The fact that the disjunctive term 'or' was used does not negate the legislature's ability to use one adjective to modify multiple nouns. *** Moreover, in order to interpret the statute [so that 'oral' modifies only 'promises'], we must assume the legislature employed improper grammar. Specifically, if 'oral' only modifies 'promise' then 'misrepresentation' does not

have a proper article where the statute would read '[a] local public entity is not liable for an injury caused by *an \*\*\** misrepresentation of its employee, whether or not such promise or misrepresentation is negligent or intentional.' We will not make such an assumption." (Emphasis added.) *Id.* ¶ 26.

¶ 36 Here, "the commonly understood principles of grammar and usage" dictate that the drafters of Rule 103(b)(1) intended that the adjective "contemporaneous" modify both "trial objection" and "offer." *Id.* As in *Lyons*, we do not believe that the use of the disjunctive "or" between "trial objection" and "offer of proof" negates the drafters' ability to use one adjective to modify both nouns. *Id.* Indeed, "to interpret [Rule 103(b)(1) so that 'contemporaneous' modifies only 'trial objection'], we must assume the [drafters] employed improper grammar." *Id.* Specifically, if "contemporaneous" were read to modify only "trial objection," then "offer" would have an improper article: "*a \*\*\** offer of proof must be made to preserve a claim of error for appeal. (Emphasis added.)" Ill. R. Evid. 103(b)(1) (eff. Oct. 15, 2015). Like the court in *Lyons*, "[w]e will not make such an assumption." *Lyons Township*, 2017 IL App (1st) 161574, ¶ 26.

¶ 37 This reading is also consistent with our understanding of the law before the rules were adopted ("Accordingly, unless the trial court rules otherwise,[4] the proponent is ordinarily required

---

[4]We note here the traditional discretion afforded the trial court in managing the trial process. The trial court's discretion controls the form and scope of the offer of proof. See 1 John H. Wigmore, Evidence in Trials at Common Law § 20a, at 869, 872, 876 (Tillers rev. ed. 1983) (form of the offer of proof is within the discretion of the trial court, whether "a full-dress formal offer of proof" or "an informal, or 'lawyer,' offer," and scope of the offer may be reasonably restricted by trial court). "The trial court must have some ability to limit the disruption and expense

to make his offer of proof *immediately* after that court has sustained an objection and excluded the evidence." (Emphasis added.) (1 John H. Wigmore, Evidence in Trials at Common Law § 20a n.4, at 862 (Tillers rev. ed. 1983))) and of the rules as intending to incorporate without change the law in this area (see Ill. Rs. Evid., Committee Commentary (adopted Sept. 27, 2010); Anne M. Therieau, *New Illinois Rules of Evidence*, 24 DCBA Brief 32, 32-33 (Dec. 2011)).

¶ 38 To ensure an orderly trial process, the court and opposing counsel must have "a clear idea what the proffered evidence is" when the court rules on the evidence. *County of Peoria v. Couture*, 2022 IL App (3d) 210091, ¶ 86 (citing *Cundiff v. Patel*, 2012 IL App (4th) 120031, ¶ 20); see *Covarrubias v. City of Chicago*, 2021 IL App (1st) 191639-U, ¶ 43 ("In our view, submitting informal written offers of proof solely in connection with a posttrial motion where the party did not make an adequate offer of proof at trial does not comply with Rule 103."); *Snowstar Corp. v. A&A Air Conditioning & Refrigeration Service, Inc.*, 2024 IL App (4th) 230757, ¶ 72 ("It is the duty of counsel to develop a record showing the trial court was satisfied it understood the nature of the evidence the party sought to admit.").

¶ 39 This case illustrates why a contemporaneous offer of proof is essential. When the trial court sustained the State's hearsay objection, the court did not know the substance of F.B.'s threat. The trial court would have been better informed about the admissibility of the threat had it heard the specifics of the proposed testimony. Providing the substance of that threat for the first time in a posttrial motion was simply too late. By not making a contemporaneous offer of proof, defendant

_____

to all parties, the court, and witnesses that may be occasioned by extensive formal offers of proof that have little value for purposes of appellate review." *Id.*

forfeited his argument that the trial court erred in precluding him from testifying about the substance of F.B.'s threat.

¶ 40　While we find the issue defendant raises forfeited, we note that the plain error rule can be invoked to bypass forfeiture. See *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); see also Ill. R. Evid. 103(e) (eff. Oct. 15, 2015). The plain error rule allows us to review a forfeited issue when (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "[the] error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565. Here, defendant bears the burden of raising plain error. See *id.* at 563.

¶ 41　The problem in this case is that defendant has not raised the plain error rule. Defendant did not argue in his initial brief that, despite his failure to make a contemporaneous offer of proof during the trial, this court may review as plain error whether the trial court erred when it barred him from testifying about the substance of F.B.'s threat. Rather, defendant asserted that "the error is fully preserved for review because it was objected to at trial and included in the post-trial motion." He cites *People v. Woods*, 214 Ill. 2d 455, 470 (2005) ("Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review.") in support of that proposition. But that citation is out of context. The issue in *Woods* was not the necessity of an offer of proof, but whether a defendant who failed to object at trial to the chain of custody in a drug case could avoid forfeiture on appeal by recasting his argument as one of the "sufficiency of the evidence." The supreme court held that the defendant procedurally defaulted his chain of custody challenge. *Id.* at 473.

¶ 42    In its brief, the State claimed that defendant forfeited review of the issue because, among other things, he failed to make an offer of proof at trial. In his reply brief, defendant does not argue that the plain error rule applies. See *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000) (appellant may raise the plain error rule in reply brief). Rather, defendant asserts that, because "the trial court ruled on the [objection] at trial, then affirmed that ruling post-trial after reviewing the offer of proof, the record here is sufficient for this Court to review the trial court's decision denying admission of the evidence, and this Court should not find the argument forfeited." We disagree. Because defendant failed to invoke the plain error rule in either his initial or reply briefs, we will honor the forfeiture. See *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010) ("[W]hen a defendant fails to present an argument on how either of the two prongs of the plain-error doctrine is satisfied, he forfeits plain-error review."); *People v. Moss*, 205 Ill. 2d 139, 168 (2001) ("Defendant makes no effort to argue that the evidence at his trial was closely balanced nor does he maintain the alleged errors were so fundamental that they denied him a fair and impartial trial. This failure results in waiver."). Thus, we need not address the merits of defendant's argument that the trial court erred in barring testimony about the substance of F.B.'s threat.

¶ 43    Forfeiture aside, defendant presented to the jury evidence of F.B.'s behavior problems around the time of her complaint, defendant's role in her discipline, and the fact that she threatened him in connection with her discipline. Counsel also argued extensively to the jury about F.B.'s potential bias against defendant, her motive to lie about defendant for his role in selling her phone, and the import of her threat to him. We think the omission of her exact words to defendant "could not have affected the outcome of the case" (*People v. Wills*, 2017 IL App (2d) 150240, ¶ 58) and is harmless beyond a reasonable doubt (*id.* (holding that, where there was other evidence of

complaining witness's unhappiness with living with her father, the erroneous refusal of a particular reason for conflict with the defendant was cumulative and insufficient for plain error)).

¶ 44    Finally, defendant places great weight on the fact that the jury sent a note to the court about the threat. We refuse to speculate about the jury's concerns. See *People v. Cardona*, 158 Ill. 2d 403, 413 (1994) (noting that "the jury's question does not necessarily suggest a belief that the defendant was not guilty \*\*\*. In short, [the] defendant's argument with respect to the significance of the jury's note is founded upon nothing more than speculation, in which we decline to engage.").

¶ 45                                B. Reasonable Doubt

¶ 46    Defendant argues that he was not proved guilty beyond a reasonable doubt of both count II and count III, alleging aggravated criminal sexual abuse. The indictment alleged he committed these crimes by "plac[ing] his hand on the sex organ of [F.B.] for the purpose of \*\*\* [his] sexual arousal." The relevant question for us is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the responsibility of the trier of fact, the jury here, to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *People v. Brown*, 2013 IL 114196, ¶ 48. We will not substitute our judgment for that of the jury on issues involving the weight of the evidence or the credibility of the witnesses. *Id.* A defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 47    To prove defendant guilty of aggravated criminal sexual abuse as charged here, the State had to prove beyond a reasonable doubt that (1) defendant committed an act of sexual conduct with F.B., (2) F.B. was at least 13 but under 17 years old, and (3) defendant was at least 5 years

older than F.B. See 720 ILCS 5/11-1.60(d) (West 2018). For purposes of this appeal, " '[s]exual conduct' means any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, *** for the purpose of sexual gratification or arousal of *** the accused." *Id.* § 11-0.1.

¶ 48    Defendant does not argue that the State proved *neither* charge (in counts II and III) of aggravated criminal sexual abuse based on his touching F.B.'s vagina. Rather, he argues that the State failed to prove his guilt as to *both* of those counts of aggravated criminal sexual abuse. He claims that F.B.'s testimony that defendant rubbed her vagina, she left the couch, and "[defendant] did it once more" when she returned to the couch was sufficient to prove him guilty of only one of the two counts. He argues that the State had "to elicit testimony from F.B. clarifying the meaning of her testimony, '[h]e did it once more.' " We disagree.

¶ 49    The evidence, viewed in the light most favorable to the State, established the following: F.B. was sitting on one of the living room couches when defendant approached and sat next to her; no one else was on the first floor, and M.V. was sleeping upstairs; while F.B. was alone, defendant appealed to F.B. by taking an interest in what she was doing on the iPad and asking her to show him how to play a game; he retrieved a blanket to cover them both; he closed his eyes; and, while pretending to be asleep to deny any accountability, he began an assault on F.B. by putting his hands on her legs, specifically her thigh, close to her hip; F.B. "continuously *** tried to *** move [his hands] away from [her,]" signaling to defendant that she did not want to be touched, yet defendant "continuously put [his hands] back on [her]"; defendant, still pretending to be asleep, then touched F.B. in a more intimate place, between her legs, rubbing her vagina; at that point, F.B. got up from the couch and left the room; she returned to the couch and sat next to defendant; defendant then "did it once more, and when [F.B.] removed his hand that time, he put his hand over the blanket

and \*\*\* he squeezed one of [her] breasts"; and F.B. immediately left the room and went to her mother.

¶ 50 The logical inference to draw from this evidence is that, when defendant "did *it* once more," he rubbed F.B.'s vagina, particularly in light of her testimony that "and when [she] removed his hand *that* time," he squeezed her breast. Defendant's actions leading up to his "d[oing] it once more" had escalated, beginning with his touching F.B.'s thigh and ending with his rubbing her vagina a second time before squeezing her breast. Given the circumstances and the sequence of events, the jury could reasonably infer that, when defendant "did it once more," he rubbed F.B.'s vagina. See *People v. Smith*, 246 Ill. App. 3d 647, 651-52 (1993) (where the defendant and the victim both had the same venereal disease after the sexual assault, but the medical reports did not establish who had the disease first, the jury could logically infer that the defendant transmitted the disease to the victim during the attack, because the victim testified that she did not have a venereal disease before the attack and that she told the defendant that she was a virgin); *People v. Harris*, 187 Ill. App. 3d 832, 839 (1989) (the jury could infer, from the defendant's admission to " 'feeling [the victim] up' " and " 'rub[bing] her vagina,' " that some penetration, however slight, did occur), *abrogated on other grounds by People v. Fern*, 189 Ill. 2d 48, 55 (1999). Here, "[t]he evidence [considered] as a whole is not so unsatisfactory as to justify a reasonable doubt of defendant's guilt in this instance." *Smith*, 246 Ill. App. 3d at 652.

¶ 51 F.B.'s testimony was corroborated by other evidence viewed in the light most favorable to the State. M.V. testified that she remembered three times during the summer of 2018 when she went downstairs to check on defendant and F.B. M.V. recalled that, on the night F.B. went to M.V.'s room, she had earlier checked on F.B. and saw defendant seated alone on one of the couches. She spoke briefly with defendant. M.V. testified that, within five minutes after M.V.

returned to her bedroom, F.B. went to M.V.'s room, which is consistent with F.B.'s testimony that, after defendant "did it once more" and then squeezed her breast, she immediately left and went to her mother's room and lay beside her. M.V. also testified that defendant told M.V. that F.B. was teaching him to play a game and that she was in the bathroom. M.V.'s account was consistent with what F.B. said occurred the night she was abused, except that F.B. testified she went into the kitchen, not the bathroom. But minor discrepancies in testimony affect only its weight (*People v. Gray*, 2017 IL 120958, ¶ 36), and "[i]t is the function of the jury as the trier of fact to assess the credibility of the witnesses and to resolve discrepancies and inconsistencies in the evidence" (*People v. Jackson*, 2020 IL 124112, ¶ 66). In this case, the verdict is supported by the evidence.

¶ 52     Defendant argues that we should not accept the jury's credibility determinations because aspects of F.B.'s testimony "def[y] *** universal human experience." Defendant cites the fact that F.B. returned to the couch after defendant touched her vagina the first time and that F.B. did not immediately tell M.V. what had happened, opting instead to give her a letter from her diary several weeks later. We reject defendant's argument. As the State observes, it is not uncommon for child victims of sexual abuse to delay reporting. See, *e.g.*, *People v. Avila*, 180 Ill. App. 3d 345, 351 (1989) (jury was entitled to credit child victim's testimony over parents' even though victim delayed reporting the abuse for several years, waiting until she had a fight with her mother about an unrelated issue).

¶ 53     Both F.B. and defendant testified that they considered each other family. See *id.* (rejecting the defendant's credibility argument based on victim's failure to promptly report, in part, because victim testified the defendant silenced her with "accusations that she was trying to destroy the family"). Further, F.B. testified that she did not tell her mother right away because she knew defendant was financially supporting her and her family, which M.V. confirmed. The jury could

also reasonably infer that F.B., who was only 13 years old, was apprehensive about talking to her mother concerning any sexual activity, regardless of whether that activity was consensual or not. As in *Avila*, "[t]he jury could determine the credibility of the witnesses and reasonably conclude that the testimony of the victim was clear and convincing. The evidence is not so palpably contrary to the findings or so unreasonable and improbable as to cause a reasonable doubt as to defendant's guilt." *Id.*

¶ 54 Defendant's arguments amount to nothing more than a request that we reweigh and reevaluate the evidence to favor him. Resolving conflicts in the evidence and weighing inconsistencies are within the province of the trier of fact. *People v. Hernandez*, 319 Ill. App. 3d 520, 533 (2001); *People v. Hruza*, 312 Ill. App. 3d 319, 325 (2000). "[The] trier of fact is free to accept or reject as much or as little as it pleases of a witness's testimony." *People v. Walls*, 2022 IL App (1st) 200167, ¶ 29 (citing *People v. Logan*, 352 Ill. App. 3d 73, 81 (2004)). We will not reassess F.B.'s credibility or reweigh the evidence, as it is not our function to retry defendant. See *People v. Patterson*, 314 Ill. App. 3d 962, 969 (2000). Viewing all the evidence in the light most favorable to the State, which we must, we determine that defendant was proved guilty beyond a reasonable doubt of both counts II and III.

¶ 55                                III. CONCLUSION

¶ 56 For these reasons, we affirm the judgment of the circuit court of Kane County.

¶ 57 Affirmed.

*People v. Gutierrez*, **2024 IL App (2d) 230260**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 19-CF-139; the Hon. David P. Kliment, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Anne C. Fung, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Max Boose, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |